[710 NYS2d 363]

Micheline Charpié, Appellant, v Pierre A. L. Charpié, Respondent.

First Department, July 13, 2000

### APPEARANCES OF COUNSEL

*David A. Field* of counsel (*Field, Lomenzo & Turret, P. C.*, attorneys), for appellant.

*Joan L. Ellenbogen* of counsel (*Ellenbogen & Goldstein, P. C.*, attorneys), for respondent.

### OPINION OF THE COURT

SAXE, J.

Much has been said about the postdivorce gender gap, in which men's standard of living increases and women's decreases after a divorce (*see, e.g.*, Weitzman, *The Economic Consequences of Divorce are Still Unequal*, 61 Am Soc Rev 537 [1996]; Braver, *The Gender Gap In Standard of Living After Divorce: Vanishing Small?*, 33 Fam L Q 111 [1999]). Recognizing the economic realities that women frequently earn less than their husbands, and that they often sacrifice their own career advancement, or any career at all, in the interests of caring for their husbands and children, our Domestic Relations Law appropriately provides numerous protections to women. Their noneconomic contributions are taken into account in the context of equitable distribution of marital assets (Domestic Relations Law § 236 [B] [5] [d] [6]); their earning power in relation to that of their spouses, and any lost earning capacity resulting from foregoing educational or employment opportunity, must be considered in awarding spousal support (Domestic Relations Law § 236 [B] [6] [a] [3], [4], [5], [8]). And, recognizing that when divorcing spouses have vastly different access to funds, a spouse who lacks financial resources may not be able to obtain the necessary assistance so as to achieve a just resolution of the issues, the monied spouse may be directed to pay counsel fees to the lawyer of the nonmonied spouse (Domestic Relations Law § 237 [a]).

The unusual circumstance of having one litigant pay the other side's counsel fees, even during the course of the litigation, while unique to matrimonial litigation, reflects the recognition of the unequal economic positions of men and women in a traditional marriage arrangement. Counsel fees are awarded "to make sure that marital litigation is shaped not by the power of the bankroll but by the power of the evidence" (Scheinkman, Practice Commentaries, McKinneys Cons Laws of NY, Book 14, Domestic Relations Law C237:1, at 6, citing *O'Shea v O'Shea*, 93 NY2d 187).

Matrimonial litigation in New York is expensive. It has been repeatedly recognized that in a fiercely contested case, the

costs of the litigation can consume the marital estate of even an affluent couple (*see generally*, Saxe, Perspective, *Reflections on Matrimonial Lawyers, Judges and Practice—Part I*, NYLJ, Jan. 8, 1993, at 2, col 3; City of NY Dept of Consumer Affairs, *Women in Divorce: Lawyers, Ethics, Fees & Fairness* [Mar. 1992]). Even women in possession of decent-sized financial resources have cause for concern when it becomes apparent that disputed issues will require litigation, because those resources can dissolve rapidly once a battle begins. Unless she continues to receive a substantial income, beyond that which she needs for living expenses, a woman in the midst of matrimonial litigation, even a formerly well-to-do woman, may wind up without funds and in debt.

Recognizing this reality of litigation, the possibility that even a woman who had enjoyed an affluent lifestyle can end up in dire financial straits cannot be ignored. Ironically, the theoretical framework for the concept of the "feminization of poverty," normally applied to households headed by women with only limited or low-level employment opportunities, whose earnings and resources fall short of their families' basic needs (*see*, Rowe, *The Feminization of Poverty: An Issue for the 90's*, 4 Yale J L & Feminism 73, 74), becomes applicable to the affluent in this context. When a couple's affluence has been due to the earnings of the husband, and his wife's earnings are minimal in comparison with the family's lifestyle, their separation and their divorce proceedings can leave such a wife without funds and at the mercy of her ex-husband, whose cooperation in making support payments is the only thing keeping her and their children from a lifestyle of substantially reduced means.

These considerations should be kept in mind on an application for counsel fees in a matrimonial litigation where a wife has assets that, although considerable, are finite, while her husband's wealth is far greater and his earnings continue to amass. When a wife's expected attorneys' fees will exhaust a large portion of her finite resources, while her husband will be able to pay his ongoing attorneys' fees without substantial impact on his estate, the court should not limit itself to inquiry into whether the wife is able to pay her attorney with the funds then in her possession.

Rather, when considering an application for interim counsel fees, the court must consider the relative financial circumstances of *both* parties (Domestic Relations Law § 237 [a]). This direction is intended not only to permit determination of

one side's need and the other's ability to pay; it is also to ensure that a spouse with substantially greater financial resources cannot use those resources against the less powerful spouse to obtain the outcome he desires. "The courts are to see to it that the matrimonial scales of justice are not unbalanced by the weight of the wealthier litigant's wallet" (*O'Shea v O'Shea*, 93 NY2d 187, 190, *supra*).

At one time this Court espoused the rule that counsel fees were precluded any time the spouse making the application had already paid her attorney, thus demonstrating the ability to pay (*see, e.g., Kann v Kann*, 38 AD2d 545). However, it has since been held that her possession of assets, and her use of some of those assets to pay counsel, does not preclude the court from awarding counsel fees (*see, DeCabrera v Cabrera-Rosete*, 70 NY2d 879, 881).

The oft-repeated rule that "[i]ndigency is not a prerequisite to an award of counsel fees" (*DeCabrera v Cabrera-Rosete*, 70 NY2d 879, 881, *supra*), while true, should not be understood to imply that a spouse's assets must be spent down to near-indigency before a counsel fee application will be entertained. A party who has finite assets and a small income should not be required to spend down a substantial portion of those assets in order to qualify for such an award, where her spouse appears to have much more extensive assets and income, with the concomitant ability to conduct legal battles over any contested issue. This holds especially true if, in addition, there are indications that the spouse with the financial clout may intend to assert his will over such issues of mutual concern as the children's care and custody, prepared to take unilateral action, and to conduct a legal battle if his wife disagrees.

All of the foregoing observations come into play in the present case. The parties and their four children, ranging in age from 9 to 14, are citizens of Switzerland who moved to New York in 1994. In order to do so, plaintiff wife, who had been working as a pediatrician, gave up and sold her medical practice in Switzerland.

Defendant husband is a European-trained attorney and businessman with an international law practice. The apartment they now reside in was purchased for $1,200,000. The children attend the Lycee Francais, take music lessons at the French American Conservatory, and the two daughters take ballet lessons. Family vacation travel has included such destinations as Bali, Hawaii, New Zealand and Australia. According to plaintiff, the family's living expenses are over $300,000 per year.

The assets plaintiff has in her possession, $160,000, consist primarily of the proceeds of the sale of her practice. Her current income, derived from her employment with the French American Conservatory, a not-for-profit music school attended by their children, is approximately $24,000 per year, before taxes. In denying plaintiff's application for counsel fees, the motion court took particular note that defendant is paying $2,000 per week for spousal maintenance and child support, as well as making direct payment for private school tuition, the children's extracurricular activities, domestic help, and medical and life insurance. The court also noted that plaintiff has already paid a $25,000 retainer to her counsel; defendant asserts that he paid a retainer of $20,000. What the motion court did not note is that in view of the parties' prenuptial agreement, the plaintiff will receive no distributive award; whatever sums she is forced to spend on this action will not be replenished at its conclusion.

The court apparently gave no consideration at all to the extent of defendant's resources. Defendant asserts that his annual income is $183,000; however, plaintiff provides substantial basis for her assertion that it is actually far greater, in view of their lifestyle during the marriage. Defendant's statement of net worth does not report the total value of his estate, marital and separate, inasmuch as the numerous businesses he owns have not been valued; those assets whose value he acknowledges total approximately $300,000. Inasmuch as defendant's statement of net worth is incomplete, it is appropriate to apply an adverse inference on the issue of his finances (*see, Wildenstein v Wildenstein*, 251 AD2d 189, 190). Certainly, there is good reason to acknowledge the possibility that defendant's wealth is substantial, far in excess of the funds to which plaintiff has access.

Given the large discrepancy in the parties' respective incomes and the assets at their disposal, as well as the nature of the issues in dispute, concerning child support and custody, we conclude that it was an improvident exercise of discretion to deny the plaintiff wife's application for an award of interim counsel fees on the ground that she is financially able to meet that cost herself.

The case of *Fisher v Fisher* (208 AD2d 433) does not require a contrary result. In *Fisher*, the wife could expect to receive a substantial distributive award. Here, it is undisputed that once plaintiff depletes her assets she will have no source from which to replenish any savings she must spend.

For the foregoing reasons, we reverse and remand for further consideration.

Accordingly, the order of the Supreme Court, New York County (Laura Drager, J.), entered June 11, 1999, which, to the extent appealed from, denied plaintiff's motion for an award of interim attorney's fees, should be reversed, on the law, the facts, and in the exercise of discretion, without costs, and the matter remanded for further proceedings consistent with the Opinion herein.

ROSENBERGER, J. P., ELLERIN, BUCKLEY and FRIEDMAN, JJ., concur.

Order, Supreme Court, New York County, entered June 11, 1999, reversed, on the law, the facts and in the exercise of discretion, without costs, and the matter concerning plaintiff's motion for an award of interim attorney's fees remanded for further proceedings consistent with this Court's Opinion.