[756 NYS2d 14]

Linda Silverman, Appellant-Respondent, v Joel Silverman, Respondent-Appellant.

First Department, February 20, 2003

42

**APPEARANCES OF COUNSEL**

*Robert D. Goldstein* of counsel (*Joseph L. Hutner* and *Jennifer M. Moak* on the brief; *Epstein Becker & Green, P.C.*, attorneys), for appellant-respondent.

*Pamela A. Phillips* for respondent-appellant.

**OPINION OF THE COURT**

SAXE, J.

The parties to this matrimonial action, Linda and Joel Silverman, were married in 1971, and have two children, both now emancipated. Linda commenced this divorce action in 1998, after 27 years of marriage. Joel is 60 years old and Linda is 54.

During the marriage the parties enjoyed a lavish lifestyle. In 1985 and 1986, they purchased and combined two cooperative apartments in Manhattan for $800,000, and invested $1,000,000 in improvements. They hired a decorator and furnished the apartment with valuable antiques and art. They

also owned a Southampton vacation home which they purchased in December 1980 for $415,000, to which they added improvements worth $200,000. The couple also traveled extensively.

During the early 1980s, Linda, who has a degree from McGill University, served as vice-president and director of the contemporary art department at Sotheby's. However, in 1983, she left her position at Sotheby's, and from that point forward, Joel provided the sole financial support for the family, while Linda took charge of raising the couple's children, maintaining the parties' residences and arranging all their entertaining and social events. While Linda formed her own company, Linda R. Silverman Fine Art, Inc., after leaving Sotheby's, and has conducted some business through it over the years, the extent of her earnings from the company was a reported income of $16,655 in 1998.

Joel worked throughout the marriage as an investment manager; while his income fluctuated dramatically from year to year, he earned a substantial income. His income was $637,453 in 1986, $1,479,432 in 1987, $650,747 in 1988 and $1,742,114 in 1989. However, in 1987, Joel began to suffer financial reverses, following a downturn in the financial markets. Between 1987 and 1989, the investors in his fund withdrew their money and the funds were liquidated, generating considerable taxable income for those years but effectively eliminating any source of future income.

From 1991 to 1997 the parties' average income fell to under $200,000. However, rather than change their lifestyle to reflect their new economic situation, the couple exhausted significant portions of their assets in an attempt to preserve the illusion of wealth and to maintain their lifestyle. For example, the parties mortgaged their Southampton home for $950,000, borrowed $400,000 against an annuity purchased in the 1970s, spent the proceeds of a $190,000 insurance settlement they received for water damage to the New York apartment and withdrew large sums from their Merrill Lynch CMA account. In January 1992, the parties' Merrill Lynch CMA account had a balance of $2,216,203; by January 1999, the balance was reduced to $130,000.

In 1996, Joel, with a colleague named John Bender, became involved in an offshore investment hedge fund known as Amber Arbitrage, LDC (the Amber fund), a complicated linking of several offshore investment hedge funds, based in the Cayman Islands. Joel was responsible for bringing investors to Amber

while Bender chose the investments and managed the Amber portfolio. Bender and Joel agreed to split the profits 75% to Bender, 25% to Joel; however, they did not put their agreement in writing.

From 1997 to 1999 Joel received management and performance fee payments from Amber totaling $1,700,000, in accordance with his oral agreement with Bender. However, by the time of the trial, Joel asserted that he was involved in a dispute with Bender and the other principals of Amber, who had refused to pay him any money since 1999.

Trial commenced on November 22, 1999 and ended on February 4, 2000.

In its trial decision issued March 19, 2001, in addition to its division of the marital estate, the court imputed income to defendant of $175,000 and to plaintiff of $50,000 per year. In view of Linda's health problems and extended time out of the workforce, the court awarded her permanent maintenance in the amount of $3,500 per month. It also awarded Joel $50,000 in attorney's fees, based predominantly upon the conduct of Linda's trial counsel, which the court viewed as improper and unnecessarily time-wasting.

Linda now challenges the court's denial of her application for a judgment of arrears in pendente lite support, its award of attorney's fees in favor of Joel, and also its ruling that she may not offer evidence regarding Joel's obstruction of the sale during the hearing ordered as to the amount Joel is entitled to recover for expenditures on the Southampton residence.

Joel's cross appeal challenges the award of lifetime maintenance to plaintiff and its amount, the equal division of the parties' liability for capital gains tax on the sale of the Southampton residence, and the award of half of Joel's future income from the Amber fund.

*Arrears in Pendente Lite Support*

It is undisputed that the pendente lite support order issued on February 5, 1999 directed Joel to pay plaintiff $5,000 per month in support. Moreover, plaintiff has repeatedly asserted, and Joel has never contradicted, that all payments under this order stopped after his September 1999 payment of only $2,500. Rather, as asserted in his September 1, 1999 letter to the court, and steadfastly maintained after that, Joel took the position that he had no income after January 1999 from which to pay this support obligation, because payments from the Amber fund had stopped. Accordingly, it was uncontested that no pay-

ments of support had been made after September 1999. Indeed, the trial court recognized at the conclusion of trial that the amount of arrears would need to be addressed in the posttrial memoranda of law unless the parties stipulated to the amount due.

For reasons unexplained, the attorney serving as plaintiff's counsel at the time posttrial briefs were due simply failed to submit any posttrial brief, and therefore the calculation of arrears was left unaddressed. The court's trial decision, issued March 19, 2001, which provided for lifetime maintenance to plaintiff in the amount of $3,500 per month, neither awarded arrears, denied arrears, nor held the claim to have been waived.

The issue of arrears in pendente lite support was raised again by new counsel for plaintiff in a motion brought on August 27, 2001. The court's decision on the motion held that plaintiff was entitled to arrears, and referred the calculation issue to a referee. Nevertheless, the court then concluded to the contrary in conferences March 8, 2002 and April 30, 2002, holding that the claim was waived by the failure to present evidence on the issue at trial or address it in a posttrial brief.

Initially, we reject Joel's contention that the court's allocation to each of the parties of $50,000 from the $200,000 Southampton home equity loan, during a conference on October 25, 1999, was intended to cover and eliminate Joel's support arrears or relieve him of his future pendente lite support obligation. This allocation of funds clearly amounted to preliminary distribution of proceeds from a marital asset. As such, its purpose was to prevent an immediate financial crisis, not to obviate Joel's obligation under the support order.

▆ Further, we disagree with the conclusion that Linda waived her claim to pendente lite support arrears. First, such a substantial and important entitlement should not be deemed waived merely by counsel's unexplained failure to submit a posttrial brief. "[A] waiver, by definition, is the intentional relinquishment of a known right—it must be clear, unequivocal and deliberate" (*Matter of Columbus Park Corp. v Department of Hous. Preservation & Dev. of City of N.Y.*, 170 AD2d 145, 149 [*revd on other grounds* 80 NY2d 19], citing *City of New York v State of New York*, 40 NY2d 659, 669, and *Matter of Civil Serv. Empls. Assn. v Newman*, 88 AD2d 685, 685-686, *affd* 61 NY2d 1001). Counsel's failure to submit a brief as directed is simply insufficient by itself to demonstrate the intentional relinquishment of a known right.

Nor was the claim undermined by a failure on plaintiff's part to offer evidence at trial as to arrears. That was not the issue requiring an evidentiary showing. Joel never contradicted Linda's ongoing claim, first made in her September 1999 motion, and thereafter raised periodically, that he made no further payments of support following the September 1999 payment of $2,500. All along, as the court subsequently explained on April 30, 2002, the issue on the arrears motion was not whether Joel had made payments, but whether Joel's application for a reduction or elimination of his pendente lite support obligation was justified by the trial evidence.

As a practical matter, it appears that the court dealt with plaintiff's motion for pendente lite arrears and Joel's letter-application to modify his pendente lite support obligation by implicitly referring to trial the issue of whether Joel was entitled to the sought modification. Inasmuch as the trial court, after hearing Joel's evidence as to his financial position, determined that he could pay $3,500 per month for maintenance, at best the court could be said to have granted Joel's September 1999 letter application to modify his pendente lite support obligation to that extent. This would only reduce, not eliminate, plaintiff's entitlement to arrears in pendente lite support.

Inasmuch as there was no waiver of Linda's right to pendente lite arrears, and the existence, though not the extent, of arrears was established, the issue should have been referred for a hearing.

*Award of Attorney's Fees to Defendant*

The IAS court awarded Joel $50,000 in attorney's fees, out of a total of over $200,000 incurred, noting that this award was based upon the dilatory conduct of both Linda and her then counsel. This conduct was principally founded upon Linda's adherence, through the litigation, to the contention that Joel had secret offshore assets, which contention she was ultimately unable to prove, although it also included other acts by Linda that the court considered to have substantially increased the amount of fees Joel had to incur in the course of litigation.

■ This award of attorney's fees was not proper under Domestic Relations Law § 237, because awarding attorney's fees to the monied spouse does not comport with the purpose and policies of that section of the Domestic Relations Law. Furthermore, although the ruling may be better characterized as a sanction rather than an attorney fee award under section 237, under Rules of the Chief Administrator of the Courts (22 NYCRR) § 130-1.1, such a sanction may only be awarded where

the procedures set forth in 22 NYCRR part 130 are followed (*see Landes v Landes*, 248 AD2d 268). Those procedures were not followed here.

Section 237 (a) permits the court to direct either spouse to pay counsel fees to the other spouse "to enable that spouse to carry on or defend the action or proceeding as, in the court's discretion, justice requires, having regard to the circumstances of the case and of the respective parties." The intent of the provision is to ensure a just resolution of the issues by creating a more level playing field with respect to the parties' respective abilities to pay counsel, "to make sure that marital litigation is shaped not by the power of the bankroll but by the power of the evidence" (Scheinkman, Practice Commentaries, McKinney's Cons Laws of NY, Book 14, Domestic Relations Law C237:1, at 6, citing *O'Shea v O'Shea*, 93 NY2d 187; *see Charpié v Charpié*, 271 AD2d 169). Therefore, where the parties' respective financial positions gives one of them a distinct advantage over the other, the court may direct the monied spouse to pay counsel fees to the lawyer of the nonmonied spouse (Domestic Relations Law § 237 [a]). The statute's reference to "having regard to the circumstances of the case and of the respective parties" (*id.*) permits consideration of many factors, but focuses primarily upon the paramount factor of financial need (*see Kremler v Kremler*, 199 AD2d 901, 902; *Matter of Mullen v Just*, 288 AD2d 476, *lv denied* 97 NY2d 613, *cert denied* 537 US 820).

Here, while the limited remaining marital assets were divided evenly between the parties, Joel's earning capacity going forward was substantially higher than Linda's, such that he would be capable of maintaining or approximating the lifestyle the couple previously enjoyed, while she would not. To the extent the playing field was skewed, it was to Joel's advantage. An award of counsel fees to Joel would not level the playing field, but rather, would serve merely to punish Linda for what the court viewed as wasteful, frivolous litigation conduct. An attorney fee award of such a punitive nature is permissible, not under section 237, but only under 22 NYCRR 130-1.1. Indeed, to the extent the award of counsel fees was based upon the wasteful* or frivolous litigation conduct of Linda or her trial attorney, it would fall squarely within the

---

* In any event, we question the label of "wasteful" to the extent it is attached to Linda's insistence on conducting discovery geared toward uncovering evidence of secret offshore accounts. It does not follow from Linda's fail-

explicit purpose of 22 NYCRR 130-1.1 (c), which authorizes an award of counsel fees where conduct by a party or attorney "is completely without merit" or "is undertaken primarily to delay or prolong the resolution of the litigation, or to harass or maliciously injure another."

The cases relied upon by Joel are not to the contrary; in *none* of them was an award of counsel fees under Domestic Relations Law § 237 made in favor of the spouse in the better financial position. For instance, in *De Bernardo v De Bernardo* (180 AD2d 500), the defendant wife earned slightly more than the plaintiff husband, and had apparently secreted away a greater (although undetermined) portion of the parties' marital assets; the trial court's award of counsel fees to the plaintiff husband was therefore upheld as a proper exercise of the trial court's discretion, "particularly in light of its findings that defendant-wife engaged in dissembling and obstructionist tactics" (*id.* at 502).

While it is conceivable that a counsel fee award to which a nonmonied spouse might otherwise be entitled could be *reduced* to the extent that party's conduct was considered to be frivolous or wasteful, it is improper to direct the nonmonied spouse to pay a portion of the other's fees under Domestic Relations Law § 237.

*Distribution of Future Payments from Amber*

■ Joel challenges the trial court's determination that all future income from Amber is a marital asset, to be split evenly between the parties. He argues that any future income from Amber is not marital property, since the couple received all of the income from Amber to which he was entitled through 1998. Any further income he receives or recovers from Amber, he contends, will be for services rendered subsequent to commencement of the divorce action.

However, as the trial court found, Joel's right to such further payments from Amber arises not merely from continued efforts, but a result of his formation of Amber during the marriage, his acquisition pursuant to his agreement with Bender of the perpetual right to 25% of Amber's fees, and the years of effort he devoted to making Amber successful during the marriage. He recognized Bender's talent, and took all the steps necessary to create the fund, hiring counsel, choosing the place of incorporation, coming up with the contacts to invest, and

---

ure to uncover evidence of secret offshore accounts that her belief in their existence was sanctionable.

working to build the business. As such, the ongoing right to payment from Amber is better viewed as dividends or appreciation of Joel's ownership interest in Amber, acquired and fostered during the marriage. Moreover, it is clear that Joel's entitlement to future distributions from Amber vested during the marriage. Thus, those distributions are also marital property, as in *Hartog v Hartog* (85 NY2d 36), where the husband's bonus was earned during the marriage but payable after commencement of the divorce proceeding.

*Lifetime Maintenance*

■ Joel challenges the trial court's award to Linda of $3,500 per month permanent maintenance. First, he criticizes as unfounded the finding that his expected earning potential is $175,000, asserting that he is 60 years old, has not held down a job in the last 30 years, and has no future as an investment professional. He argues that he had virtually no income for the last several years, other than from the liquidation of the couple's assets and the stream of income from Amber, all of which has dried up.

However, we find ample support for this aspect of the trial court's determination. First, it is undisputed that Joel is an experienced investment professional with over 30 years' experience. He created the Amber fund out of nothing more than his introduction to Bender, and reaped huge profits from that endeavor. Even in his worst years, his income—whether from investments or otherwise—was not less than $200,000, and was often in the very high six figures. Also, as the trial court noted, Joel has extremely valuable business contacts, which allowed him to attract investors into Amber, and which could generate income for him in a number of ways. Significantly, these contacts rebut the notion that Joel has "lost his touch" in the investment industry. As with Amber, Joel need not actually manage investments; he was able to do very well by connecting his contacts to investment professionals.

Moreover, contrary to his statement about not working in 30 years, in 1995, Joel earned $107,000 in W-2 income working for Gruntal & Co.

Accordingly, the imputation of $175,000 was not unreasonable, and the sum awarded to Linda from that amount as maintenance was similarly proper.

Joel next argues that the award of permanent maintenance was improper, contending that Linda could be self-supporting, inasmuch as she never stopped working, having opened and

operated her own art dealer business during the marriage. He also contends that in light of certain of her purchases of art, imputation of only $50,000 a year of income to her is far too low.

Again, the factual record sufficiently supports the trial court's findings to defeat Joel's challenge. It is well settled that lifetime maintenance is proper where, inter alia, the marriage was of long duration, one spouse sacrificed employment opportunities for the family, and her earning potential is far below the standard of living the couple established in the course of the marriage (see *Kirschenbaum v Kirschenbaum*, 264 AD2d 344, 345). It is not sufficient that the wife be able to support herself in "some" lifestyle, if she cannot attain the couple's prior lifestyle on her own (*id.*).

Here, notwithstanding Linda's continued limited business activities after the children were born, she was their primary caregiver, and sacrificed her own career development for the marriage. Moreover, after this 27-year marriage, Linda cannot be expected to achieve an income even remotely like the couple's $700,000-plus annual lifestyle. The court's imputation of $50,000 a year of income to her was proper, and as such, the award of permanent maintenance is affirmed.

*Capital Gains Tax*

The trial court ordered that the parties must each pay 50% of the capital gains tax on the sale of the Southampton house into an escrow fund, to then be disbursed to pay that tax. Joel contends that this was contrary to the parties' trial stipulation, which provided that "[t]he parties shall be equally responsible for the capital gain tax due as a result of the sale. The estimated amount of such liability shall be escrowed from the sales proceeds."

Joel contends that when the parties agreed to be "equally responsible" for the tax, they did not mean each would pay out cash equal to 50% of the tax, but that each party would declare 50% of the capital gain as income on their separate tax returns, and bear whatever tax consequences flowed from that income. This is important for Joel, because this would allow him to offset his share of the tax with, among other things, his deduction for maintenance payments.

The wording of this stipulation provision, making the parties "equally responsible for the capital gain tax due," was properly interpreted by the trial court. Had they intended simply to equally divide the capital gain between them for purposes of

calculating their separate capital gains tax liability, they could easily have so stated.

Finally, a review of the record supports the trial court's refusal to allow Linda to offer evidence to a special referee as to Joel's alleged obstruction of the sale of one of the matrimonial homes. The issue upon which the evidence's admission was sought had been thoroughly litigated in prior hearings and was thus properly removed from further contention.

Accordingly, the judgment of the Supreme Court, New York County (Marylin Diamond, J.), entered May 1, 2002, which: (a) denied plaintiff's motion for a money judgment for arrears in defendant's court-ordered pendente lite support obligations; (b) awarded defendant $50,000 in attorney's fees; (c) precluded plaintiff from presenting evidence of defendant's alleged obstruction of sale of the parties' Southampton residence in an upcoming hearing before a special referee; (d) ordered defendant to pay plaintiff a lifetime award of maintenance of $3,500 a month; (e) awarded plaintiff a percentage of postcommencement income from an investment fund; and (f) ordered that the parties each pay 50% of the capital gains tax from the sale of their Southampton residence, should be modified, so as to delete the award of attorney's fees to defendant and to refer for hearing the issue of arrears in pendente lite support, and as so modified, affirmed, without costs.

Motion seeking leave to strike brief denied.

ANDRIAS, J.P., BUCKLEY, ROSENBERGER and MARLOW, JJ., concur.

Judgment, Supreme Court, New York County, entered May 1, 2002, modified, to delete the award of attorney's fees to defendant and refer for hearing the issue of arrears in pendente lite support, and as so modified, affirmed, without costs. Motion seeing leave to strike brief denied.