Singer v Singer (2003 NY Slip Op 51519(U))

[*1]

Singer v Singer

2003 NY Slip Op 51519(U)

Decided on December 17, 2003

Supreme Court, Nassau County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on December 17, 2003

Supreme Court, Nassau County
 MARVIN SINGER, Plaintiff,
against
SUSAN SINGER, Defendant.
Index #: 019977-99

ROBERT A. ROSS, J.
The following papers have been read on this motion by the defendant for counsel fees pendente lite:
Order to Show Cause, Affirmation in Support, Exhibits ..............1
Affirmation and Affidavit in Opposition, Exhibits....................... 2
In addition to a careful review and examination of the aforementioned papers, I also directed and heard oral argument today, to address the exigency of the issue before me.
This application for pendente lite counsel fees is made during the pendency of the trial of this matter. Such application for counsel fees may be made prior to, during, or after a matrimonial trial. See, Hinden v. Hinden, 472 NYS2d 248; Estis v. Estis, 2003 NY Slip Op 17559 (Oct. 20, 2003).
ENFORCEMENT COMPONENT TO AN AWARD
OF LEGAL FEES IS ESSENTIAL TO A "LEVEL PLAYING FIELD"
The Court of Appeals maxim of a "level playing field" and "litigation parity" flow from the statutory intent and application of Domestic Relations Law §237(a), "to make the more affluent spouse pay for the legal expenses of the needier one" (O'Shea v. O'Shea, 93 NY2d at 190 [footnote omitted]) and "to redress the economic disparity between the monied spouse and the non-monied spouse" (see, O'Shea, supra, at 187, 190; see, also, DeCabrera v. Cabrera-Rosete, 70 NY2d 879). Given the conceptual and philosophical importance of these doctrines, their application should not serve as unfulfilled tenets.
The preparation of a motion for legal fees requires significant time, attention to detail, and expense. See Uniform Rules for Trial Courts §202.16(k)[1-6]. But when legal fees are granted, the sanctity and compliance to which such determination must be entitled, is frequently displaced by a prolonged gauntlet of recalcitrance, yet more motion practice, and lingering enforcement efforts. This defeats the "litigation parity" that the order seeks to attain in the first [*2]instance. A myriad of attorney-client difficulties are created by these enforcement dilemmas, spiraling to instances of termination/withdrawal, inordinate delay, or even providing the genesis of complex and tangled counsel fee collection issues, as unraveled by our Appellate Division in Frankel v. Frankel, 309 AD2d 65.
The circumstances of the instant case present an all-too-common occurrence of discovery obfuscation, efforts to wear down opposing counsel and frustration of reasonable settlement offers - - - all facilitated with a vast plethora of financial resources to accomplish such derisive tactics. The misassertion by plaintiff, that he is lacking in financial resources, highlights the use of such tactics, and his net worth statement serves to amplify same.
Accordingly, and in my view, awarding legal fees here, without a detailed provision in the order that fashions concomitant enforcement, undermines the "level playing field" and makes "litigation parity" especially vulnerable.
Is there a basis for such a self-executing order of legal fees?
By way of analogy, the importance of simultaneous and immediate compliance of an order in matrimonial litigation is found in payment of child support through income execution order (CPLR §5241), and even as to awards of equitable distribution through a Qualified Domestic Relations Order (QUADRO). The concept has been further expanded to secure health insurance by use of a Qualified Medical Support Order (QMSO). In considering legal fees, the IAS Matrimonial Court in a divorce action has the statutory authority to "award counsel fees to a spouse to enable [emphasis added] that spouse to carry on or defend the action as, in the Court's discretion, justice requires, having regard to the circumstances of the case and the respective parties." See, Domestic Relations Law §237(a). Determination of the legislative intent is provided by a literal reading of the words of the statute (see, McKinney's Consolidated Laws of N.Y., Book 1, Statutes §92[b], 94. See, also, Patrolmen's Benevolent Association v. City of New York, 41 NY2d 205. And, as in this instance, "where the legislative intent is clear and unambiguous from the language of the statute, the words used should be construed so as to give effect to their plain meaning." See, People v. Cypress Hills Cemetery, 208 AD2d 247; Frankel v. Frankel, supra. The statute's direction to either spouse to pay such sum or sums of money "to enable" [emphasis added] that spouse to carry on or defend the action, could not be any clearer. To "enable" is "to give the means to do something; to make easy or possible." See, Webster's New Century Dictionary, 2003 Edition, Random House Publishing. It is only axiomatic, that such "enablement" cannot really occur without prompt payment of legal fees, as a Court may order.
An award of counsel fees, without more, clearly satisfies the seminal precedent of our Court of Appeals (see, O'Shea v. O'Shea, supra; DeCabrera v. Cabrera-Rosete, supra). But the notion of a "level playing field" and "litigation parity" to "enable that spouse to carry on or defend the action" can be more effectively fostered and expeditiously facilitated with a concomitant component in that order providing for simultaneous enforcement of those fees. The [*3]nexus that exists in the award of legal fees with an appropriate enforcement method, is entirely necessary and appropriate to comply with the statutory mandate "to consider the circumstances of the case and the respective parties" (see, Domestic Relations Law §237[a]). Moreover, the utilization of an order which provides for a synchronous enforcement component, also underscores the O'Shea directive that "the courts are to see to it (emphasis added) that the matrimonial scales of justice are not unbalanced by the weight of the wealthier litigant's wallet" (see, O'Shea, at 187, 190; see, also, Charpie v. Charpie, 271 AD2d 169).
Accordingly, in awarding the defendant the sum of $100,000 in legal fees as detailed herein, I am sua sponte directing as an enforcement component of this order, that such payment be made within 20 days of the date of this order, or the plaintiff shall be precluded [FN1] from offering any testimony or evidence as to any of his extensive claims of separate property or equitable distribution of marital property.
PRECLUSION AS AN
ENFORCEMENT COMPONENT
Given the circumstances of this case, and in sua sponte determining an appropriate enforcement device, I have given considerable thought to imposing a stay on these proceedings. I note a strong likelihood of success on some of defendant's claims to equitable distribution, the irreparable injury if she is unable to adequately defend or prosecute her positions without payment of her legal fees for which she is entitled as a result of this order, and the balancing of the equities here, all of which probably warrant a stay. See, Bender Insurance Agency v. Treiber Insurance Agency, 283 AD2d 448, 449. But, I am acutely aware of the important public policy consideration in prompt dispositions of litigated matters, as well as my concerns of appropriate case management. Moreover, I am further mindful of the important Appellate Division maxim of a speedy trial, to facilitate an examination of the facts and to permit an accurate appraisal of the circumstances of the parties. See, Felton v. Felton, 175 AD2d 794. And, I have also carefully considered the ambits of Domestic Relations Law §239 - - - at one time, the practice of granting such stays in divorce actions was "common," the rationale being "the unfairness in allowing a spouse to use the courts to obtain relief that he or she wanted, while contemporaneously, that party was in default under court-imposed obligations." See, Scheinkman, Practice Commentary, Domestic Relations Law §239, McKinney's Consolidated Laws of N.Y., Book 14, Practice Commentary, p. 118. However, Domestic Relations Law §239 was designed to restrain the power of the courts to stay divorce and separation proceedings. "The prevailing view is that matrimonial cases should not be allowed to linger and fester, and should be brought to conclusion as expeditiously as possible." See, Scheinkman, supra. Following this guidance, it would appear that a stay of these proceedings would be palpably improper.
In tailoring the appropriate enforcement vehicle, and "having regard to the circumstances of this case and the parties" (see, Domestic Relations Law §237[a]), I have considered the [*4]frequent instances of inexorable recalcitrance, discovery obfuscation and overwhelming obstructionist tactics, all on the part of the plaintiff, some of which are painfully detailed herein.[FN2] Accordingly, to the extent I am awarding the defendant the sum of $100,000 in legal fees as detailed herein, in the event such fees are not paid within 20 days of the date of this order, plaintiff shall be precluded from offering any testimony or evidence regarding his detailed claims of separate property or equitable distribution in this trial, which is in a "ready and continuing" posture. The preclusion order, typically utilized in response to a willful violation of discovery, is a particularly omnipotent enforcement vehicle, given the history here. See, Kaplan v. Herbstein, 175 AD2d 200; Gillman & Ciocia v. Lewis Pasquin, New York Law Journal, July 6, 2002, p. 22, col. 3. To the extent I am obligated to make appropriate findings of fact for equitable distribution (See, O'Brien v. O'Brien, 66 NY2d 576, 589; see, also, Domestic Relations Law §236[B][5][d][g]; Hartnett v. Hartnett, 281 AD2d 900), such responsibility can be more than met by evaluating the testimony and evidence of the defendant, who still has the burden of establishing her claims to equitable distribution (Iwahara v. Iwahara, 226 AD2d 346; Grebel v. Grebel, 128 AD2d 834).
In Frankel v. Frankel, supra, Justice Altman's important dissent provides a well reasoned and cogent analysis of the broad discretion and flexibility afforded to matrimonial courts in "achieving the purpose" of Domestic Relations Law §237(a). In my view, efficacious utilization of that "flexibility" is critical. However meticulous an order granting legal fees should be in carefully considering and detailing all appropriate factors, there ought be an equal sense of consideration to the inclusion of a simultaneous enforcement component in such order to facilitate the guidance of O'Shea and DeCabrera. Any concern as to the harshness of the remedy at hand, is wholly diluted by the reality that exposure to an "unlevel playing field" should be no more acceptable to the non-monied spouse, than it is for the monied spouse.
If this Court is obliged to "see to it that the matrimonial scales are not unbalanced by the weight of the wealthier litigant's wallet," the efficacious trial that will be had here, ought to be conducted upon a precept of the "level playing field" that our Court of Appeals proscribes (see, O'Shea, at 187, 190), and that compliance with this order will accomplish.
AWARD OF LEGAL FEES
The award of legal fees is a matter within the sound discretion of the trial court (Walker v. Walker, 255 AD2d 375), controlled by the circumstances and equities of each case. I have considered herein the relative merits of the parties' positions, as well as their respective financial positions (DeCabrera v. Cabrera-Rosete, supra). An evaluation of what constitutes reasonable counsel fees is a matter left to the sound discretion of the trier of fact (Pena v. Pena, 255 AD2d 498; Kwong-Yo Lee v. Oi Wa Chan, 245 AD2d 270), who is often in the best position to judge those factors integral to the fixing of counsel fees. See, Pauk v. Pauk, 232 AD2d 386; Levine v. Levine, 179 AD2d 625. The assertion of the plaintiff that this issue should not be determined [*5]prior to the conclusion of the trial, is grating. The "issue of fact" portended to the appraised value of the defendant's residence, does not give her the liquidity to pay counsel fees, nor should she be required to deplete such asset. The further assertion by plaintiff, at ¶5, that "I have a negative worth of $140,000," is specious and wholly incredible - - - the liabilities of $900,000 (see V of plaintiff's net worth statement) are all "owed to" Howard Singer for an unexplained debt in 1994 for which no payment is reflected on the net worth statement. Howard Singer, plaintiff's son, was also his real estate investment associate, having "joined him in the real estate business in 1994" (see ¶6 of plaintiff's affidavit). And, in the same paragraph, this individual was acknowledged to be transferring assets to the plaintiff, even after this purported indebtedness to him was incurred.
The monthly expenses of plaintiff are listed as $5,291, and his monthly income is $2,019, a shortfall of $3,272 per month. Notwithstanding the "shortfall," the plaintiff maintains a membership to St. Andrew's Golf Club, located near his condo in Boca Raton, Florida. His 2001 Cadillac, purchased for $35,000, utilizes fuel of $125 per month; his pool club incurs an expense of $500 per month; nowhere is there listed the "repayment of the $900,000 debt to his son. By way of assets, the plaintiff reflects a 1997 Chris Craft boat, $53,000 in securities, his Boca Raton condo worth $650,000, and $48,000 in an IRA account. This is not exhaustive, but illustrative of his financial ability, as opposed to a feigned claim of financial inability. He has paid his two counsels a total of $50,000 to date, and the suggestion that defendant's litigation conduct had been "provocative," given the history here, is wholly and absolutely incredible.
I have examined the respective net worth statements of the parties, containing their income, expenses and assets. The defendant-wife moves this Court to grant counsel fees and expenses in the amount of $130,578.30. A review of the extensive time sheets, annexed as an exhibit, and counsel's affirmation, which detail and describe the services rendered and the necessity for such services, reflects 429 hours of legal services rendered from July 26, 1999 until October 31, 2003, for a total of $112,089.75. The defendant's attorney has carefully documented the charges listed in his affirmation of services rendered. See, Pinto v. Pinto, 260 AD2d 622; DeVivo v. DeVivo, 2003 NY Slip. Op. 19266 (December 8, 2003). There have been additional expenditures of $4,288.71 for postage, court fees, photocopies, process services, and no part of which are for office overhead expenses. There is also a claim, pursuant to the retainer agreement, for accrued interest in the amount of $14,199.84 on the unpaid balance. The defendant has already been credited with total payments toward legal fees in the amount of $21,700.
It is well settled that an award of attorney's fees should be "reasonable in light of the skill, experience and background of counsel, the nature of services rendered, the difficulty and complexity of the issues of fact and law in the case, as well as the time actually spent in the case" (Willis v. Willis, 149 AD2d 584). I note that the billing rate at the time of the retainer agreement was $375, and notwithstanding the four year age of the case, defendant's counsel has indicated that he did not apply his current billing rate of $450 per hour, which would be well in keeping with rates charged by practitioners with similar background and experience.
[*6]
Courts generally do not attempt an item-by-item review of time records and, instead, make an overall assessment as to what constitutes a fair and reasonable fee under the circumstances (Scheinkman, New York Law of Domestic Relations, §19.5 at 136, citing Reid v. Reid, 166 AD2d 811). However, given the amount of legal fees requested here, I have carefully reviewed all of the time sheets, entries, and counsel's affirmation that details the legal services and the necessity for same. In considering the "other circumstances" of this case (see, DeCabrera v. Cabrera-Rosete, supra), I have weighed that although this matter was litigated for more than four years, such inordinate delays were not caused by extraordinary complex legal issues or facts, but rather, in large part, due to the conduct of the plaintiff,[FN3] an experienced attorney. See, Kurtz v. Kurtz, 2003 N.Y. Slip Op. 18406 (Nov. 18, 2003). The recalcitrance of plaintiff included being held in contempt by order dated March 4, 2002 (LaMarca, J.) for his failure to continue health insurance of the defendant; his son and business associate, Howard Singer, was directed by order dated January 19, 2001 (Falanga, J.) to appear for deposition by service via certified mail because he was evading service with the assistance of the plaintiff, who was residing with him; and, at a deposition conducted by defendant's counsel, the plaintiff, who is an experienced attorney, typified his conduct and the belligerent, obstreperous tenor of this litigation in the following manner:
"MR. SINGER: It's only costing you money, hon. I could talk forever.
MR. MITCHELL: I'm going to ask Mr. Botter that you, once again, speak
to your client about his extraneous statements. They're obviously meant
to irritate my client.
MR. SINGER: Could you please talk to me about them?
MR. MITCHELL: All right. I'll talk to the court.
MR. SINGER: You're going to talk to the court?
MR. MITCHELL: If you wish to play games.
MR. SINGER: Are you threatening me? If you want me to leave and
you're packing up your bag, Mr. Big Mouth, then tell me and I'll leave,
you son of a bitch.
MR. MITCHELL: Mr. Singer is raising his voice at me. He referred to
me as a son of a bitch, and now he's packing up his bag.
[*7]
MR. SINGER: You are a son of a bitch. Just like her. She deserves
you. You told me to leave, and I'll leave.
MR. MITCHELL: I did not tell you that. I did not.
MR. SINGER: Tell me what to do, big mouth.
MR. BOTTER: Sit down and keep quiet. Just sit down.
MR. SINGER: You know what? My doctor told me as soon as it gets
red, out of here, and he did it.
MR. BOTTER: Are you saying that you are not feeling well enough to
continue?
MR. SINGER: I am saying, and I know just what I am saying. I'm
going to sit outside in the waiting room, and I'm going to wait five
minutes. And I'm going to give him one chance to eat crow. He doesn't
want to. She can come back. He can come back. We can go to the
Judge, and you can go to hell. And I learned it from her, the garbage
mouth. You deserve her." (Recess taken) (Page 285-287, Deposition
Transcript, October 4, 2000).
Thereafter, plaintiff's physical destruction of documents at a further deposition and other recalcitrant conduct during discovery, resulted in the Court's appointment of a referee by order dated January 16, 2001 (Falanga, J.). In considering the defendant's claim of frustration of discovery (MacMurray v. MacMurray, 187 AD2d 840), obstructionist tactics (Merrick v. Merrick, 190 AD2d 515) and the merit of each parties' positions (Brancoveanu v. Brancoveanu, 177 AD2d 614), I view that the plaintiff, an experienced attorney, not only has acted contemptuously in the conduct of litigation, but has failed to provide discovery in a "studied and deceptive attempt to secret assets." See, Kurtz, supra; see, also, Silverman v. Silverman, 304 AD2d 41, 48. In point of fact, during the course of the limited trial testimony already taken, the plaintiff's direct case has already been beset by two instances of important documents he sought to introduce into evidence, which had been previously represented by him to be "unavailable or lost."
I have also afforded considerable weight to the fact that defendant's counsel, Stephen Gassman, has provided diligent and efficacious representation to the defendant non-monied spouse in the face of substantial unpaid invoices, obstructionist tactics and steadfast opposition. The practical difficulties encountered with discovery, the time expended, the ability to posture a trial, and the willingness to undertake/continue a defense of this magnitude, have all been important considerations of this Court in granting the relief sought herein.
[*8]
Moreover, I am relying on my own knowledge, experience and familiarity (see, Palumbo v. Palumbo, 292 AD2d 358; LeRoy v. LeRoy, 276 AD2d 442) with the parties' financial circumstances in determining this application (see, LeRoy v. LeRoy, supra, at 442). In this instance, my consideration of the parties' net worth statements that wholly reflect inapposite financial positions, easily underscore plaintiff's far superior financial position. The assets here include savings accounts, several undisclosed parcels of real estate alleged to have been sold within the year prior to commencement of the action, the plaintiff's law practice from which he claims to be retired, a condo in Boca Raton, Florida, a Golf Bond, a large boat (described as a yacht), and the claim to appreciation in defendant's home, located in Kings Point, New York. I also note that this is a childless marriage with a pre-nuptial agreement, that remains in full force. This matter is involved, but clearly not so complex as to undertake four years of litigation.
A party who engages in obstructionist tactics may be required to pay the legal fees of the other (Katzman v. Katzman, 284 AD2d 160; Gober v. Gober, 282 AD2d 392), especially as in this situation, where such conduct has caused the defendant to incur considerable legal fees that she is not possessed to pay. Plaintiff has rejected reasonable settlement offers to posture a trial, knowing that defendant is without resources to afford, or properly prepare for it. While the award of legal fees is not intended to address a party's decision to proceed to trial rather than agree to a settlement (see, O'Shea, supra; Comstock v. Comstock, 2003 N.Y. Slip Op. 17997 [Nov. 3, 2003]), the relative merits of the parties' positions and actions during this litigation have been especially important and should be considered, as well. See, Walker v. Walker, 255 AD2d 375; Tayar v. Tayar, 250 AD2d 757; Gorelik v. Gorelik, 2003 NY Slip Op 12050 (March 17, 2003). 
CONCLUSION
I am "mindful of the precedential and consequential future effect" of this determination (see, Laver v. City of New York, 95 NY2d 95, 100). But, if the Court is to adhere to the important mandate of our Court of Appeals in O'Shea and DeCabrera to "see to it" that the "matrimonial scales of justice are not unbalanced by the weight of the wealthier litigant's wallet," then an exercise of the Court's broad discretion in granting legal fees can be prudently tailored to pre-empt and disarm recalcitrance, the culprit of litigation disparity. The product of such a circumspect, flexible approach, applied on a case-by-case basis, is a carefully fashioned order of legal fees, with the appropriate attendant enforcement necessary to "level the playing field." Litigation parity for the non-monied spouse in a matrimonial action can only be attained when the "rules of the litigation road" are determined by the IAS trier of fact, and not abrogated by one of the parties.
My careful consideration of all aspects of this application for legal fees, and the circumstances detailed herein, warrant that the motion be granted to the extent that plaintiff shall pay to defendant's counsel, Stephen Gassman, the sum of $100,000 in legal fees, pendente lite, within 20 days of the date of this order. Moreover, on this Court's own sua sponte motion, if such payment is not made as directed herein, the plaintiff shall be precluded from proffering any [*9]testimony or evidence as to any claims of separate property or equitable distribution.
The parties and their counsel shall appear before me on January 16,
2004 for continuation of this trial, or further proceedings consistent with this order.
 This constitutes the decision and order of this Court.
Dated: Mineola, New York
 December 17, 2003
E N T E R :

_____________________________
 HON. ROBERT A. ROSS
 J.S.C.
Decision Date: December 17, 2003
Footnotes

Footnote 1: Discussion, to follow herein.

Footnote 2: Such conduct is detailed in that portion of the decision granting legal fees.

Footnote 3: A careful review of the history of this matter reflects that each of the plaintiff's attorneys
 provided diligent and appropriate representation. It is the obstreperous actions of the
 plaintiff himself that have placed him in the situation in which he now finds himself.