OPINION OF THE COURT
Matthew F. Cooper, J.
This is one of those all-consuming divorce cases involving very wealthy parties, each of whom has a team of lawyers and a retinue of expert witnesses. The amount of counsel and expert fees generated so far has been astounding, even in the world of “high-end” matrimoniáis. Not surprisingly, the issue of who will pay these fees as the case moves forward is now before the court.
From the commencement of the action in December 2010 until February 2013, a period during which the parties were largely engaged in discovery and motion practice, the plaintiff husband, the owner of a successful hedge fund, paid all of the counsel and expert fees that both he and the defendant wife incurred. That sum was close to $1 million. In March 2013, just prior to trial, the wife’s attorneys billed the husband $238,196 for their services rendered that month. He paid that bill in full. In April 2013, during which the first eight days of trial took place, the wife’s attorneys billed the husband $355,329 for their services. In addition, the husband was billed $74,853 for the *1063 wife’s experts’ services. At that point, in the midst of a financial trial[1] that had only just begun and having been billed a total of $668,378 for the wife’s fees for March and April alone, to say nothing of his own counsel fees, the husband decided he could no longer foot the litigation costs for both sides. Accordingly, the husband declined to pay the April 2013 bills or any subsequent bills incurred by the wife for her attorneys’ or experts’ services absent further order of the court.
Pointing to the fact that the wife receives $75,000 a month in combined temporary child and spousal support and that she stands to walk away from the marriage with somewhere in the vicinity of $10 million in equitable distribution, the husband asserts that it is time for the wife to assume some of the burden for the cost of the litigation. In so doing, he invokes a phrase that might not be found in a legal dictionary or used in any reported case, but is heard frequently in the context of matrimonial proceedings. The phrase is “skin in the game,” and it refers to the belief that the best way to insure that a party to a divorce will litigate reasonably and responsibly is to require the party to share in the cost of the litigation.[2]
The husband has now moved for an order authorizing him to release $2 million from marital funds and evenly share that amount with the wife so that each party can pay his or her own interim litigation expenses.[3] He argues that not only has his income and personal funds significantly declined over the last two years, but that permitting the wife to proceed without “skin in the game” will enable her to push forward with the litigation without any concern for its cost or an eye towards settlement.
The wife opposes the release of the money for the payment of counsel and expert fees. She maintains that she has “skin in the game” by virtue of having to travel from France to make periodic court appearances and that she is every bit as motivated *1064 as the husband to reach a fair resolution of the case. Moreover, the wife argues that because she has no income other than the $75,000 monthly support payments, she must be considered the nonmonied spouse and therefore entitled under statutory and case law to have the husband, the monied spouse, pay her interim legal fees. She further contends that the law is clear that these payments must come from the husband’s income and separate funds rather than marital funds so as not to deplete her assets.
New York has long sought to prevent wealthy litigants from gaining an advantage in divorce proceedings simply by being able to spend more on representation than their less well-to-do spouses. In discussing the counsel fees provision of the Domestic Relations Law as it existed before its amendment, the Appellate Division, First Department, stated the following as to its purpose and effect:
“The intent of the provision is to ensure a just resolution of the issues by creating a more level playing field with respect to the parties’ respective abilities to pay counsel, ‘to make sure that marital litigation is shaped not by the power of the bankroll but by the power of the evidence.’ Therefore, where the parties’ respective financial positions gives one of them a distinct advantage over the other, the court may direct the monied spouse to pay counsel fees to the lawyer of the nonmonied spouse (Domestic Relations Law § 237 [a]).” (Silverman v Silverman, 304 AD2d 41, 48 [1st Dept 2003] [citations omitted].)
The legislature made the fees provision even stronger in 2010 when it amended Domestic Relations Law § 237 (a). Where previously the statute had merely given courts the power to direct the payment of interim counsel fees “as, in the court’s discretion, justice requires,” the 2010 amendment is clear that such discretion should ordinarily be exercised in favor of awarding fees. It states:
“There shall be [a] rebuttable presumption that counsel fees shall be awarded to the less monied spouse. In exercising the court’s discretion, the court shall seek to assure that each party shall be adequately represented and that where fees and expenses are to be awarded, they shall be awarded on a timely basis, pendente lite, so as to enable ade *1065 quote representation.” (Domestic Relations Law § 237 [a].)
Fees are particularly important in divorces because a wide gap in the parties’ abilities to retain counsel will make the playing field decidedly uneven and will result in the wealthy spouse gaining a sizeable advantage in the case. As one court has observed, absent an award of counsel fees “a wealthy husband could obtain the services of highly paid (and presumably seasoned and superior) matrimonial counsel, while the indigent wife, essentially, would be relegated to counsel willing to take her case on a poverty basis.” (Sassower v Barone, 85 AD2d 81, 89 [2d Dept 1982].) Without the infusion of funds from the monied spouse, the nonmonied spouse would be unable “to prevent the more affluent spouse from wearing down or financially punishing the opposition by recalcitrance, or by prolonging the litigation.” (O’Shea v O’Shea, 93 NY2d 187, 193 [1999].) As a result, it is incumbent on courts “to see to it that the matrimonial scales of justice are not unbalanced by the weight of the wealthier litigant’s wallet.” (Id. at 190.)
In this case, there is nothing to indicate that the husband has sought to use his financial resources to make the playing field uneven or the scales of justice unbalanced. There has been no evidence of recalcitrance on his part nor any suggestion that he has attempted to unnecessarily prolong the litigation; to the contrary, the husband has consistently shown himself to be eager to move the case forward to a resolution. Nor is there any disparity between the seasoning and quality of the parties’ legal teams; both are represented by firms at the apex of the New York matrimonial lawyer hierarchy. And any fear of the wife being “relegated to counsel willing to take her case on a poverty basis” should be abated by the fact that the three lawyers who regularly appear together for her in court are billing at hourly rates of $900, $700 and $500.[4]
To be sure, the husband is not seeking to deprive the wife of the high level of representation that she has enjoyed. Nor is he asking that she pay anything out of the $75,000 she receives each month as pendente lite support. What he is seeking — after almost three years of litigation, during which time he has significantly reduced his separate assets paying both his and his wife’s litigation fees — is to have a relatively small portion of the *1066 parties’ millions of dollars in marital assets made available for the payment of each side’s fees.
Although Domestic Relations Law § 237 (a), as amended, creates a presumption that interim counsel fees will be awarded to the less monied spouse, that presumption is nevertheless a rebuttable one. As such, courts retain the power to evaluate the merits of a fee application and determine the appropriate amount, if any, to be awarded. That determination, as it has always been, “is a matter within the sound discretion of the trial court, and the issue is controlled by the equities and circumstances of each particular case.” (Patete v Rodriguez, 109 AD3d 595, 599 [2d Dept 2013] [internal quotation marks and citations omitted].) “[I]n exercising its discretionary power to award counsel fees, a court should review the financial circumstances of both parties together with all the other circumstances of the case, which may include the relative merit of the parties’ positions.” (DeCabrera v Cabrera-Rosete, 70 NY2d 879, 881 [1987].)
In considering the husband’s motion, the initial focus must be directed to the parties’ overall financial circumstances. There is no question that the husband is the spouse with the far higher income. Although he is earning less than the astronomical sums he reaped a few years back when his hedge fund was booming, his compensation is still in the millions. The wife, on the other hand, remains unemployed and is living on the $75,000 monthly interim support payments she receives from the husband. But the fact that the husband’s income exceeds the wife’s does not necessarily make him the “monied spouse” for the purposes of determining interim counsel fees.
As one experienced matrimonial judge has stated in an opinion issued in the wake of the legislature’s amendment of Domestic Relations Law § 237 (a), “the court cannot decide that just because one party ‘earns more’ than the other that he or she automatically becomes the ‘monied spouse.’ ” (Scott M. v Ilona M., 31 Misc 3d 353, 369 [Sup Ct, Kings County 2011].) Thus, the requisite inquiry as to the parties’ financial circumstances cannot — and should not — be restricted to income alone. Instead, “the court must realistically assess the available resources to each party as a result of the litigation.” (Id. at 371.) To this end, consideration must be given not only to the assets that each side now has in his or her possession, but to those assets which each party stands to obtain through equitable distribution.
*1067 Prior to litigation entering the actual trial stage, the husband had a bank account with more than $3.7 million in post-commencement separate funds. That sum has been reduced during the course of this year by $1.2 million, largely by the expenditures the husband has had to make for both sides’ litigation costs. The wife controls approximately $500,000 in an account in France, but those funds consist almost entirely of precommencement marital money. Thus, the overwhelming bulk of the assets that either side holds are marital assets. These include the $7.6 million in the couple’s Fidelity brokerage account, the husband’s interest in his hedge fund and other business entities, the wife’s French bank account, the houses owned by the parties but occupied by other family members, and the home in Darien, Connecticut, which the husband purchased for himself subsequent to the commencement of the divorce.[5]
Both sides acknowledge that the wife will receive 50% of the nonbusiness marital assets. And while the parties dispute the share of the husband’s business assets to which the wife is entitled, it appears at this juncture that it will be a meaningful one. With every indication being that the wife will indeed receive approximately $10 million as her share of equitable distribution, it is difficult to find that the husband’s financial situation is so far superior to the wife’s that he must continue to pay 100% of her litigation costs from his income or out of his separate property. Simply stated, the wife may not have nearly as much money available to her now as the husband but once the case has concluded and the marital assets have been distributed, she will be a multimillionaire. Accordingly, there is not such a “significant disparity in the financial circumstances” (Prichep v Prichep, 52 AD3d 61, 65 [2d Dept 2008]) between the parties that one side must be made to bear the full responsibility for the legal fees of the other.
The question then becomes whether it is appropriate to utilize marital assets for the payment of interim counsel and expert fees. Although it has been held that a party “cannot be expected to exhaust all, or a large portion, of the finite resources available to her in order to pay her attorneys” (id. at 66), there *1068 seems to be little danger of that occurring here inasmuch as the amount that the wife is poised to receive from equitable distribution will exceed many times over whatever she contributes to the cost of her representation. And while decisions of the Appellate Division of this department are clear that a party “should not have to deplete her assets in order to have legal representation comparable to that of [her husband]” (Lennox v Weberman, 109 AD3d 703, 704 [1st Dept 2013]) or “spend down a substantial portion of [her] assets in order to qualify for ... [a counsel fees] award” (Charpié v Charpié, 271 AD2d 169, 172 [1st Dept 2000]), no such burden is being placed on the wife here. According to Webster’s Dictionary, “deplete” means “to use most or all of” or “to greatly reduce the amount of.” Thus, it is hard to see how releasing $1 million to each side from the large pool of marital funds available for equitable distribution could somehow threaten to “deplete” the wife’s assets. Likewise, while the release of the money to pay the wife’s current litigation fees may constitute a “spend down” of her assets, the amount involved — which is somewhere in the vicinity of 10% of what the wife can be expected to receive by way of equitable distribution — certainly does not qualify as a “substantial portion” of those assets.
It bears repeating that even with the statutory presumption in favor of awarding counsel fees, the determination of an application is still a matter within the sound discretion of the trial court. (See Lennox v Weberman, 109 AD3d 703 [1st Dept 2013]; Patete, 109 AD3d at 599.) It is not a mechanical operation whereby one side can be made to pay all of the other side’s legal fees simply by virtue of having greater income, or even by having a greater overall net worth. There are other considerations that must come into play. Among the factors that need to be considered are “the equities ... of each particular case.” (Grant v Grant, 71 AD3d 634, 635 [2d Dept 2010].)
In this case, the equities are on the side of relieving the husband from his obligation to continue paying all of the wife’s interim counsel fees out of his own pocket. In so finding, the court is receptive to the husband’s argument with regard to the notion of “skin in the game.” As it stands now, it is solely the husband who suffers any financial consequences as a result of the litigation going forward; the longer the case goes on, the more days of trial there are, the more the husband spends. Consequently, he has every incentive to curtail the litigation to the extent possible, even if that means accepting a settlement *1069 that falls short of what he wants. The wife, on the other hand, without any “skin in the game,” does not have the same incentive insofar as her litigation costs are being paid for completely by her adversary. Because that adversary is her soon-to-be ex-husband, and because the case is a divorce where feelings of animosity, betrayal and abandonment constantly lurk just below the surface, one can easily understand how the wife, perhaps against her better instincts, might find that it serves her interests on a number of levels to make the husband continue to expend copious funds on her behalf. Rather than giving the parties equal footing on a level playing field, the present arrangement “gives one of them a distinct advantage over the other.” (Silverman, 304 AD2d at 48.) Ironically, given that the husband is the party who now has the “heavier wallet,” it is the wife who has the “distinct advantage” because of her unfettered access to that wallet.
In light of the foregoing, the court concludes that it is fair and appropriate for the $2 million to be released from marital funds, with half to go to the husband and half to the wife. Each side will use the sum to pay his or her own outstanding and prospective counsel and expert fees. The release of the funds will be subject to reallocation at the conclusion of the trial. Reallocation, if appropriate, will occur after the court has had the opportunity to hear the case in its entirety and consider such additional factors as the “relative merit of the parties’ positions” (DeCabrera, 70 NY2d at 881), “the nature and extent of the services rendered, the complexity of the issues involved, and the reasonableness of the fees under all of the circumstances.” (Grumet v Grumet, 37 AD3d 534, 536 [2d Dept 2007].) If it is ultimately determined that the husband should still be responsible for a portion of the wife’s litigation fees, then that amount will serve as a credit in favor of the wife when computing each side’s share of the marital estate. Until that time, both sides’ interim fees will be paid in the manner provided for herein.
For the reasons stated in this decision, it is ordered that the plaintiff husband’s motion is granted.

. The only issues before the court in this divorce proceeding are financial. All issues involving custody of and access to the parties’ child were heard in France, where the wife and the child currently reside.

. The phrase, widely used in financial circles with regard to an individual’s stake in an investment, is often attributed to famed investor Warren Buffett.

. As part of the husband’s motion, he originally sought an order changing the valuation date of his hedge fund from the date of commencement to the date of trial, as well as an order allowing him to remove $500,000 from marital funds to be invested back into the hedge fund so as “to preserve this marital asset.” Just prior to final submission of the motion, the husband withdrew his application to set a new valuation date and the wife consented to the reinvestment of the $500,000.

. The husband also has three attorneys who appear en masse for him on trial days. Their hourly rates are lower, though only marginally so, than the wife’s attorneys’ rates.

. The husband purchased the house, in violation of the automatic stays, using $3.8 million in marital funds. Despite the violation, the court declined to hold the husband in contempt of court, finding that the “marital funds used to purchase the residence, though no longer in the form of a liquid asset, remain part of the marital estate subject to equitable distribution in the form of the Connecticut house.” (Sykes v Sykes, 35 Misc 3d 591, 597 [Sup Ct, NY County 2012].)