88 P.3d 1116 (2004)
Christina Larson SCHMITZ, Appellant,
v.
Michael John SCHMITZ, Appellee.
No. S-10759.
Supreme Court of Alaska.
April 16, 2004.
*1120 Allison E. Mendel and Mary A. Gilson, Mendel & Associates, Anchorage, for Appellant.
Kathryn Kolkhorst, Ruddy, Bradley, Kolkhorst & Reges, Juneau, for Appellee.
Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

OPINION
FABE, Chief Justice.

I. INTRODUCTION
This appeal is from a judgment determining custody and dividing property in a divorce proceeding. Christina Schmitz challenges the superior court's decision that she and her former husband, Michael Schmitz, will share custody when their son, Johnathon, turns five. Christina also disputes the superior court's characterization of certain assets as Michael's separate property, as well as its interim attorney's fees award. Because the superior court did not abuse its discretion in making its custody determination, we affirm the custody decision. Because the superior court erred in characterizing Michael's interest in the accounting firm of Schmitz & Buck as separate property without applying an active appreciation analysis, we vacate that determination and remand for analysis under the active appreciation doctrine. Because the superior court did not err in characterizing Michael's business interest in the Nugget Men's Store as Michael's separate property, we affirm that decision. Because the superior court erred in characterizing Michael's First National Bank accounts and individual retirement account (IRA) as Michael's separate property, we reverse and remand these determinations. We affirm the superior court's characterization of the Edward Jones stock account as Michael's separate property and its award of interim attorney's fees to Christina.

II. FACTS AND PROCEEDINGS

A. Factual History
Michael Schmitz and Christina Schmitz married in Juneau in January 1999. The couple's child, Johnathon, was born in March 1999. While Christina and Michael were married, Christina was Johnathon's primary caregiver. Michael and Christina separated in August 2001.
Michael is a certified public accountant and a partner in the firm of Schmitz & Buck. Michael has owned a fifty percent interest in Schmitz & Buck since November 2000. From January 1997 to November 2000, Michael owned only a thirty-three percent share in the business. In addition to his partnership in Schmitz & Buck, Michael owns a twelve-and-a-half percent share in the Nugget Men's Store, which sells men's outdoor clothing. Michael's share in the store was purchased with proceeds from a tort settlement resulting from a car accident. Michael prepares the Nugget Men's Store's monthly accounting statements and its tax return, he participates somewhat in the store's management, and he attends the store's annual meeting.
Michael holds two accounts at First National Bank Alaska. He refers to one account as his "checking" or "regular" account and the second as his "investment" or "business" account. Michael deposited income from his accounting business into both of the accounts. At trial, he explained his deposit practices: "It just depends if ... we need money for [ ] living expenses and Tina needs money or I need money, I put them into my [checking account]. If we've got enough in there, I'd just put it into [the business account]." Michael deposited money from a number of sources into his "regular" account, including funds to cover wedding expenses; profits distributed from his accounting business; *1121 transfers from his "business" account; profits from the Nugget Men's Store; wedding gifts; and baby gifts for Johnathon. Michael deposited earnings from his accounting business and proceeds from the Nugget Men's Store into his "business" account. He paid household expenses including health insurance, fuel, cable, telephone, and refuse bills out of the "regular" account. He also paid his family's taxes from this account.
Michael has a stock account at Edward Jones. He opened this account prior to his marriage. Michael started it with First National Bank stock purchased for him from the settlement funds resulting from his car accident. Michael testified at trial that he transferred the First National Bank stock into the Edward Jones account, sold that stock, and used the proceeds to invest. Michael also has an individual retirement account (IRA) at Edward Jones.
Christina has work experience in bookkeeping and office management. Although she did not work during the marriage after Johnathon's birth, she went back to bookkeeping and office management after she and Michael separated.

B. Procedural History
Michael filed a complaint for divorce in October 2001. The superior court then entered a domestic relations standing order, which prohibited each party from disposing of, encumbering, or transferring marital property without the other party's written consent or the prior approval of the court. The court appointed a custody investigator in December 2001.
Christina moved for $15,000 in interim attorney's fees in March 2002; the $15,000 represented $5,942.54 in fees already incurred and $10,000 in anticipated expenses. The court ordered Michael to pay Christina $5,000 in attorney's fees and to pay Christina's counsel the "equivalent amount that he pays his own counsel during the course of the proceedings." In April 2002 Christina filed a corrected certificate of counsel that explained that Christina's actual attorney's fees were $11,874. The court denied Christina's request for additional fees. Christina's motion for reconsideration of this decision was denied.
Trial was held in Juneau from May 28 through May 30, 2002. After trial, the superior court awarded Michael and Christina joint legal custody of Johnathon, with Christina to have primary physical custody. The court further ordered that this arrangement would change to equally shared physical custody upon Johnathon's fifth birthday. The court characterized the marital home, two cars, and items of personal property as marital assets.
The court awarded the marital home to Michael and ordered him to pay Christina $93,487 as an offset payment. All property not listed in the trial court's chart of marital assets was deemed separate property. Finding that Christina violated the standing order when she sold a marital vehicle, the court credited her with the difference between the vehicle's fair market value and the price that Christina received. The court also ordered Michael to pay Christina $10,000 in attorney's fees.
On appeal, Christina challenges the superior court's custody determination, several aspects of the property division, and the court's interim attorney's fees award.

III. STANDARD OF REVIEW
We reverse a trial court's custody determination if the court's critical factual findings were clearly erroneous or if we find that the trial court abused its discretion.[1] We set aside findings of fact as clearly erroneous if a review of the entire record firmly convinces us that a mistake has been made.[2] We will find that the trial court abused its discretion if it has considered improper factors, failed to consider relevant statutory factors, or assigned disproportionate weight to some factors while ignoring others.[3] When *1122 the trial court has based its custody determination upon improper factors, we will remand for a decision based upon proper factors.[4]
Equitable division of marital property involves three steps: determining what property is available for distribution, valuing the property, and allocating the property equitably.[5] The trial court's characterization of property as marital or separate may involve the resolution of disputed facts and questions of law. Findings of fact are reviewed under the clearly erroneous standard,[6] and questions of law are reviewed de novo using our independent judgment.[7] Whether the trial court valued the property correctly is a question of fact we review for clear error.[8] We review the trial court's distribution of assets for abuse of discretion and will overturn the trial court's determination only if the distribution is clearly unjust.[9] We review de novo whether the trial court applied the correct legal rule in exercising its discretion.[10]
The trial court has broad discretion in awarding attorney's fees in divorce actions.[11] We will not reverse a trial court's attorney's fees determination unless it is arbitrary, capricious, or manifestly unreasonable.[12]

IV. DISCUSSION
A. The Trial Court Did Not Err in Ordering a Change in Custody from Christina's Primary Physical Custody of Johnathon to a 50/50 Shared Custody Arrangement To Occur Automatically When Johnathon Turns Five.
The superior court awarded Michael and Christina joint legal custody and Christina primary physical custody of Johnathon. The court provided that upon Johnathon's fifth birthday, Christina and Michael would share custody equally. Christina raises two challenges to the court's determination that she and Michael will share custody when Johnathon turns five. First, she contends that the trial court's order is erroneous as a matter of law. Christina asserts that the court's order has no evidentiary basis and is based upon unsupported assumptions about what might be best for Johnathon in the future. Second, Christina contends that the court's order violated her due process rights because it made a "factual determination about the future without allowing the parties a reasonable opportunity to be heard."
The trial court must base custody determinations upon the child's best interests, using the factors listed in AS 25.24.150(c).[13] The court may consider other *1123 factors not listed in the statute if those additional considerations are relevant to the child's best interests.[14] Although the trial court must consider each of the factors, it need only discuss relevant factors when explaining its decision.[15]
The trial court considered the factors set out in AS 25.24.150(c) in making its custody determination. The court found that Johnathon has no special needs, that he has loving relationships with both parents, and that both Michael and Christina contributed to Johnathon's custody and care. The court noted that while Christina was in many ways more involved with Johnathon than Michael, Michael showed "a strong desire to provide for the child and a willingness to change his life to accommodate the needs of the boy." The court concluded that in the near future, Christina was better able to provide for Johnathon's needs, but that the "longer term requires additional contact, care and custody of Johnathon by [his] father."
Because a parenting plan "is intended to be a dynamic instrument," it may allow for changes under certain circumstances.[16] "[T]hese changes are enforceable as implementations of the plan, and do not require modification...."[17] An example of such a change would be a provision in a parenting plan directing that "primary custodial responsibility for a child changes when the child reaches a certain age."[18]
We have affirmed a custody determination, like the one at issue here, that achieved equal physical custody between parents in two chronological steps.[19] In Elliott v. Settje, the trial court weighed the AS 25.24.150(c) factors and recognized an additional factorthe child's young age.[20] For the remainder of the calendar year after trial, the court directed that custody change every two to three days, that the father's time increase from thirty-nine hours every two weeks to six days every two weeks, and the court prescribed the maximum time the child could be separated from either parent.[21] The trial court determined that the parents would share equal custody commencing the next calendar year.[22] Although the issues on appeal did not specifically address the two-step progress of the trial court's custody determination, we affirmed the superior court's decision.[23] And in this case, because the trial court properly considered the statutory factors and carefully crafted a custody plan that took into account Johnathon's evolving needs and interests, we affirm the trial court's custody determination.
Christina also argues that the court's order violated her due process rights because it prescribed a change in custody without affording her an opportunity to be heard. She asserts that "[i]t was not possible at the time of trial to present evidence of what custody arrangement will be in Johnathon's best interests after he turns five, because that evidence does not exist."
"Under the Alaska Constitution, procedural due process requires that a party be afforded notice and opportunity for a hearing appropriate to the nature of the case."[24] Parties to a child custody proceeding are entitled to a hearing granting them "`the opportunity to present the quantum of evidence needed to make an informed and principled determination.'"[25] Because the requirements *1124 for notice and an opportunity to be heard were met in this case, Christina's due process argument is without merit.
Christina was well aware that this issue would be argued at trial. The custody investigator's report contained the recommendation that Michael and Christina share custody when Johnathon turns five. In her trial brief, Christina acknowledged this recommendation and challenged it, arguing that "[i]t is simply too speculative to decide now whether it will be in Johnathon's best interests to alternate weeks between his parents two years in the future." Christina also made her position known in her proposed findings of fact and conclusions of law after the trial. Because Christina had notice of the proposed custody arrangement and because she had an opportunity to be heard on the matter, the superior court's order did not violate her due process rights. Accordingly, we affirm the superior court's custody determination.
B. Characterization of the Couple's Assets as Separate or Marital
The first step in equitable division of marital property requires the trial court to determine what property is available for distribution; to accomplish this, the trial court must characterize assets as separate or marital property.[26] The three primary examples of separate property are property acquired by one spouse before marriage, property acquired by gift, and inherited property. Assets acquired during marriage "as compensation for marital services"most commonly salaries earned by either spouse during marriageare considered marital assets.[27]
The superior court determined that Michael and Christina's marital property included: the marital residence, two vehicles, and certain items of personal property. The court did not list the items of property it considered separate, nor did it explain why it characterized the property as it did. However, the court made general remarks that suggest its conclusion that all property that Michael brought into the marriage remained his separate property: "The court believes that husband's separate property remains his separate property." Christina contests the superior court's characterization of a number of Michael's assets as his separate property.
1. Michael's businesses: Schmitz & Buck and the Nugget Men's Store
The trial court found that Michael's separate property, including his interest in the Nugget Men's Store and Schmitz & Buck, remained his separate property because Michael had no intention to transmute the assets from separate to marital. Christina argues that the trial court made two errors in its characterization of the Nugget Men's Store and Schmitz & Buck as separate property. First, she argues that the court erred in applying a transmutation analysis rather than an active appreciation analysis.[28] Second, she claims that the court's erroneous analysis led it to mischaracterize Michael's business interests as separate. Christina asserts that Michael spent significant marital time and energy on both *1125 Schmitz & Buck and the Nugget Men's Store. Specifically, Christina argues that Michael worked at Schmitz & Buck seven days a week during tax season, which occurs between January 1 and April 15, and that he worked approximately eleven hours each day during that period. She notes that for the Nugget Men's Store, Michael did the monthly accounting, prepared the monthly financial statements, as well as the business's tax return, and attended the store's annual meeting.
In any property division, the first step is determining what property will be divided between the parties.[29] The trial court determines what property is marital as opposed to separate.[30] Marital property includes all property acquired during the marriage, "excepting only inherited property and property acquired with separate property which is kept as separate property."[31] We have recognized that a spouse's premarital separate property can become marital through transmutation or active appreciation.[32] Transmutation occurs when a married couple demonstrates an intent, by virtue of their words and actions during marriage, to treat one spouse's separate property as marital property.[33] "Active appreciation occurs when marital funds or marital efforts cause a spouse's separate property to increase in value during the marriage."[34] We have noted that "[t]he time and energy of both spouses during the marriage is to be considered in dividing marital property."[35] A spouse should not be able to erase his or her contributions of time and energy from the marital estate "by rolling them back into a business which he began before the marriage."[36]
The elements of active appreciation are significantly different from those of transmutation.[37] Transmutation requires intent, as demonstrated through conduct, to change the character of property from separate to marital.[38] To find active appreciation in separate property, the court must make three subsidiary findings: "First, it must find that the separate property in question appreciated during the marriage. Second, it must find that the parties made marital contributions to the property. Finally, the court must find a causal connection between the marital contributions and at least part of the appreciation."[39]
In addressing the question whether the property at issue was separate or marital, the trial court focused only on the theory of transmutation. This focus was overly narrow and should have included an analysis of whether Michael's efforts during the marriage caused the value of his businesses to increase. To prevail on the active appreciation theory, Christina bore the burden of proof on the first two elementsappreciation in the property's value and marital contribution.[40] Michael bore the burden on the third *1126 element, causationwhether his efforts were connected to any increase in value that the business experienced during the marriage.[41]
As to Schmitz & Buck, Christina proved that Michael spent significant marital time working at the business: Michael testified that he worked approximately eleven hours a day, seven days a week, at Schmitz & Buck during tax season, from January through April. And although Christina's proof on the first element of appreciation in the property's value did not include evidence that the value of the firm's tangible assets or the value of its good will increased from the date of the marriage to the date of separation, according to Christina this was due to her inability to afford an expert to value Michael's business interests. Christina presented this dilemma to the superior court prior to trial, informing the court that she was financially unable to hire an expert to value Michael's business interests and requesting a continuance and the financial resources to be able to perform that valuation. Despite the trial court's earlier recognition that Christina was the economically disadvantaged spouse and its resulting order that Michael pay her "an equivalent amount he pays his own counsel during the course of the proceedings," she apparently was unable to perform the financial valuation of Michael's businesses due in part to Michael's realization that by failing to payor even openhis own attorney's bills, he could avoid paying Christina's. Because of this, Christina alleges that she was unable to prove the value of business assets such as inventory and accounts receivable or demonstrate an increase in these business assets during the course of the marriage.
But Christina did prove that Michael's revenue from the accounting business increased during the course of the marriage, from $69,419 in 1999 to $77,584 in 2001. From this evidence of increasing revenue, it can be inferred that the value of the business may have increased during the marriage. Because Christina was the financially disadvantaged spouse and asserts that she was unable, due to Michael's circumvention of the superior court's order, to hire an expert to present evidence of an increase in the value of Schmitz & Buck, and because she alerted the superior court to this predicament prior to trial, requesting appropriate relief, Michael cannot rely on the argument that she failed to meet her burden of proof on the increase in Schmitz & Buck's value.[42] Michael conceded at trial in the end of May 2002 that he had not paid any of his attorney's bills after the superior court's April 1, 2002 attorney's fees order.
Q Have you paid your attorney anything since March?
A No.
Q Do you know how much you owe her?
A To tell you the truth, no. There's been some billings, I haven't opened them. I'm just leaving them.....
Because he failed to open or pay his own attorney's bills, Michael was able to avoid paying Christina's. Where a party's inequitable conduct hampers an opposing party's ability to develop potentially important *1127 evidence, a court on appeal is justified in remanding for development of appropriate evidence. Because the proof of Michael's increased income that Christina was able to present suggests that the business's value may have increased during the marriage, we remand this issue to the superior court, to allow Christina an opportunity to present evidence of the increase in the value of Schmitz & Buck during the marriage.
By contrast, an active appreciation analysis fails on the element of marital contribution when applied to the Nugget Men's Store. The record shows that Michael's involvement with the store was quite limited: He only performed some accounting and tax returns for the store and attended its annual meeting. We cannot say, therefore, that Christina met her burden of proof on the element of marital contribution for the Nugget Men's Store. Accordingly, we affirm the superior court's determination that the Nugget Men's Store is Michael's separate property.

2. The First National Bank accounts
Christina argues that because Michael deposited money he earned during the marriage into both of his First National Bank accounts, the superior court should have characterized the accounts as marital property. Michael counters that the accounts are comprised in part of his separate property and that commingling of separate and marital funds in the accounts does not transmute the accounts into marital property. He argues that these accounts are his separate property.
In its findings of fact, the trial court never mentioned the First National Bank accounts and thus never explicitly characterized the accounts as separate. However, the accounts are not listed as joint property in the superior court's findings of fact and the trial court determined that Michael's separate property would remain his separate property. Thus, we assume that the superior court characterized the bank accounts as Michael's separate property. The superior court reasoned generally that Michael's separate assets flowed from his personal injury claim and investments arising from his settlement award. The court also found that Michael never intended to transfer any property, other than the marital home, to Christina. The court stated: "[Michael] was careful only as a trained and suspicious [certified public accountant] could be in making sure that there was not commingling and he did that intentionally and deliberately. To the extent separate money was placed in joint accounts the evidence was strong that it was only temporary and not to make into joint property."
To provide a context for our discussion of the First National Bank accounts, we must first discuss briefly the nature of separate and marital assets and the concept of tracing an asset to either a primary marital or primary separate source.[43] As mentioned earlier, the three primary types of separate property include property acquired by one spouse before marriage, property acquired by gift, and property acquired by inheritance. Assets acquired during marriage "as compensation for marital services"most commonly salaries earned by either spouse during marriageare considered primary marital assets.[44] Some assets might have been acquired through a source other than described above; for example, from another asset "through exchange, appreciation, or income."[45] These assets are referred to as secondary property because such an asset requires for its classification the classification of another asset.[46]
To classify secondary assets, courts "must first identify the specific asset from which it was derived (the source asset), and then determine the classification of that asset."[47] This process is referred to as tracing.[48] *1128 When the source asset is primary marital property, the secondary asset is secondary marital property. Likewise, when the source asset is primary separate property, the secondary asset is secondary separate property.[49] However, if the source asset itself is secondary property, tracing continues until either a primary separate or primary marital source asset is found.[50] "The process of tracing can therefore be simply described as a search of sources backward through time until every asset is linked to primary marital or primary separate property."[51]
Because bank account funds generally "are not in and of themselves either marital or separate property," bank accounts are a secondary asset.[52] Thus, if possible, the funds must be traced back to their sourceeither primary marital or primary separate property. Tracing back to the source of a secondary asset frequently stops, however, when a secondary asset's source cannot be determined.[53] When a secondary asset's source cannot be proven, it is impossible to know whether the asset in question is marital or separate property. The party seeking to establish that the property is separate always bears that burden of proof; thus untraceable assets are marital property.[54]
Both parties concede that the bank accounts included both marital and separate property. Michael concedes that $132,100 in marital earnings went into the checking account, while a total of $65,500 in separate property was contributed to both accounts. The accounts could thus be referred to as a mixed secondary asset because they have more than one source.[55] The record shows that Michael deposited money he earned during his marriage into both of the First National Bank accounts. Specifically, Michael claims that he deposited into his "regular" or "checking" account those funds needed to cover wedding expenses, profits from his accounting business, transfers from his business account, wedding gifts, and baby gifts for Johnathon. The record suggests that Michael deposited earnings from his accounting business into his "business" account. The record also suggests that in addition to marital property, Michael also deposited separate property, for example, proceeds from the Nugget Men's Store.
A spouse's separate property does not become untraceable to its separate source merely because it is mixed with marital property in the same secondary asset.[56] However, placing separate property in joint ownership is rebuttable evidence that the owner intended the property to be marital.[57] If evidence is presented that is sufficient to overcome this presumption, tracing can take place. To characterize a mixed secondary asset, the superior court must know the character of each source feeding into the mixed asset and the amount of value each source contributed to the mixed whole.[58] The court can then determine the ratio between the sources. "The marital and separate interests in a mixed secondary asset are ordinarily in the same ratio as the marital and separate contributions used to acquire the asset."[59]
If, however, the sources can be proved but their respective amounts cannot, the proper ratio cannot be determined. Thus, even when it is known that a mixed secondary *1129 asset derived partly from a separate source, if the amount contributed from that source cannot be determined, then the asset cannot be traced and "[t]he unknown amount contributed from the separate source transmutes by commingling and becomes marital property."[60]
Because the record suggests that the First National Bank accounts consisted of both marital and separate property, we reverse the superior court's determination that these accounts were solely Michael's separate property.[61] Additionally, given the above considerations and the lack of relevant findings by the superior court, we remand to the superior court to make findings as to whether the presumption that commingled property is intended to be marital has been rebutted and if so, to make findings recharacterizing the accounts.[62]

3. The Edward Jones stock account
Christina next argues that the trial court erred in characterizing the Edward Jones stock account as separate property. Prior to his marriage, Michael opened this account with stock that his father had purchased for him from Michael's personal injury settlement award. Christina asserts that Michael deposited marital earnings into the Edward Jones account. She concludes that Michael's intention to keep the Edward Jones account as separate property is irrelevant because by contributing marital funds to the account he made the account marital property. Michael counters that he did not deposit marital earnings into the Edward Jones account. He also argues that he never intended to transmute the account into a marital asset.
The trial court apparently determined that the Edward Jones account was separate property because it did not mention the Edward Jones account in the divorce decree and did not include it in the chart of marital assets. The court's reasoning as to the characterization of the Edward Jones account appears to be the same as that used for the bank accountsthat Michael did not intend to transmute the asset into marital property. A review of the record suggests that the evidence supports this finding by the superior court. Michael testified at trial that he only deposited separate funds into his Edward Jones account. He explained that he transferred funds from the settlement into his First National "business" account and then into the Edward Jones account. He testified: "There's a clear path." There is some indication in the trial court's divorce decree that the court accepted Michael's testimony; the court noted generally that Michael did not commingle funds and "[t]o the extent separate money was placed in joint accounts the evidence was strong that it was only temporary and not to make it into joint property." Because the superior court did not abuse its discretion in characterizing the Edward Jones account as Michael's separate property, we affirm this determination.
4. The trial court erred in characterizing the Edward Jones IRA as Michael's separate property.
Christina next contests the trial court's characterization of the Edward Jones IRA as Michael's separate property. She argues that the IRA is marital property because an increase in its value during marriage represents retirement contributions from marital earnings. We have held that *1130 "[t]o the extent that a party earns retirement benefits during marriage, the benefits are marital assets and are subject to equitable division."[63] Christina is entitled to a share of the marital portion of the IRA.[64] Accordingly, we reverse the trial court's determination that the IRA is Michael's separate property and remand to the superior court to determine the amount of the IRA that is marital and thus subject to division.
C. The Trial Court Did Not Abuse Its Discretion in Declining To Award Additional Interim Attorney's Fees to Christina.
Christina moved for interim attorney's fees of $15,000 in March 2002. The court ordered Michael to pay Christina $5,000 in attorney's fees and directed Michael to pay Christina's counsel "an equivalent amount that he pays his own counsel during the course of the proceedings." Shortly after the superior court's order, Christina filed a corrected certificate of counsel in support of her motion for attorney's fees. Because Christina's counsel had changed her billing system, Christina's expenses were higher than noted in her motion for fees. In her memorandum in support of her second motion to continue the trial, Christina again argued her need for attorney's fees. She asserted that the trial court's order regarding fees had impacted her trial preparation, as Michael had not paid her. Christina also claimed that she did not benefit from the trial court's order that Michael pay her the same amount that he paid his attorney because Michael stopped paying his attorney's bills in March 2002. Michael testified at trial that he did not even know how much money he owed his attorney because he had not opened the bills.
The superior court declined to award Christina further interim attorney's fees, noting that, if necessary, it would adjust attorney's fees awards at the end of the case. Christina moved to reconsider that order, arguing primarily that the court's denial of an additional fee award to Christina prevented her from litigating on an equal playing field with Michael. The trial court denied reconsideration of its order on attorney's fees. In its findings of fact and conclusions of law at the end of trial, however, the superior court awarded Christina an additional $10,000 in attorney's fees.
Under AS 25.24.140, trial courts may award attorney's fees in divorce cases.[65] The trial court has broad discretion in awarding these fees.[66] Costs and attorney's fees awards must be based primarily upon the parties' relative economic situations and earning capacities.[67] When the parties' economic situations and earning capacities are comparable, each party should bear his or her own costs.[68] Otherwise, awards of attorney's fees are committed to the trial court's discretion.[69] "In divorce actions, the purpose of awarding attorney's fees is to assure that both spouses have the proper means to litigate the divorce action on a fairly equal plane."[70]
Christina argues that the court abused its discretion in its order for interim attorney's fees "in failing to award sufficient fees to `level the playing field'...." Christina's argument that interim attorney's fees are integral in equalizing the playing field between divorce litigants is correct. *1131 We recognize the importance of interim attorney's fees in divorce proceedings. Such fee awards ensure that "marital litigation is shaped not by the power of the bankroll but by the power of the evidence."[71] Situations where the economically disadvantaged spouse does not receive interim attorney's fees may result in injustice to that spouse.[72] And as discussed above, Michael's circumvention of the court's order that he pay Christina the same amount of fees that he paid his own attorney during the course of the proceedings may have jeopardized her ability to prove that Schmitz & Buck appreciated in value during the course of the marriage. By remanding to allow Christina to present proof of the business's value, we have remedied any inequity.
But to analyze the overall adequacy of attorney's fees in this case, we must also consider a related issueChristina's sale of the family's Ford Expedition. Christina sold a Ford Expedition, a marital asset, receiving $14,500 in cash plus a replacement car worth $2,495. Christina testified that she sold the vehicle to pay for her attorney's fees. She did not inform Michael of the sale, nor did she split the proceeds with him. Because the trial court found that the sale violated the standing order,[73] it attributed the difference between the fair market value and the actual proceeds from the sale to Christina.[74]
Because Christina sold the Ford Expedition, receiving $14,500 plus a replacement car worth $2,495, she received the equivalent of $16,995 from the sale of the Ford Expedition. In the property division, the superior court valued the Ford Expedition at $23,525, but credited Christina with only $6,525, the difference between the car's value, $23,525, and the amount that Christina received for the car, $14,500 plus a $2,495 replacement vehicle. By crediting Christina with only $6,525, the superior court gave her a benefitalthough Christina received $14,500 in cash from the sale of the vehicle, plus a replacement car, the court credited her with $6,525, leaving Christina with $7,975 in cash proceeds to be applied to attorney's fees. Because we cannot say that the court's award of almost $13,000 in interim attorney's fees ($5,000 plus $7,975) to Christina, in addition to an order requiring Michael to pay her interim attorney's fees equal to his own, was an abuse of discretion, we affirm the trial court's decision. However, as discussed above, because Michael avoided paying Christina's pre-trial fees, as required by the trial court's order, by failing to pay his own attorney's fees, we have remanded to the trial court the issue of whether Schmitz & Buck's value increased during the marriage in order to avoid unfairness to Christina.

V. CONCLUSION
The superior court did not abuse its discretion with regard to its custody determination, and we therefore AFFIRM its decision that Christina and Michael will share equal custody of Johnathon upon the child's fifth birthday. Because the trial court erred in failing to consider whether the active appreciation doctrine may apply to some portion of Michael's interest in Schmitz & Buck, we VACATE the trial court's decision and REMAND for analysis under the active appreciation doctrine. Because the trial court did *1132 not err in characterizing Michael's interest in the Nugget Men's Store as his separate property, we AFFIRM that decision. We REVERSE and REMAND the trial court's determination that Michael's First National Bank accounts and IRA are Michael's separate property. Because the trial court did not err in characterizing the Edward Jones stock account as Michael's separate property, we AFFIRM that determination. Finally, because the trial court did not err in its award of interim attorney's fees to Christina, we AFFIRM that award.
CARPENETI, Justice, with whom EASTAUGH, Justice, joins, concurring in part and dissenting in part.
CARPENETI, Justice, with whom EASTAUGH, Justice, joins, concurring in part and dissenting in part.
I agree with most aspects of today's Opinion but cannot join the court's holding that Christina raised the claim of active appreciation in the trial court nor its determination that the trial court's attorney's fees rulings somehow impaired Christina's ability to litigate her case. Because Christina did not raise the claim of active appreciation in the trial court, I would affirm the trial court's determinations regarding Michael's interest in Schmitz & Buck and the Nugget Men's Store on the basis of waiver. Because the trial court did not abuse its discretion in its interim or final attorney's fees rulings, I would simply affirm them.

I. Failure to raise active appreciation

The Opinion deals with this issue in footnote 28. It notes Michael's claim that the issue was not raised in the trial court, but finds the argument without merit because Christina "argued in substance that the court should apply the active appreciation standard" and because we first used the label "active appreciation" in Martin v. Martin,[1] "a case that was decided after the Schmitz divorce trial." I respectfully suggest that both reasons fail close scrutiny.
A. "First use of active appreciation in Martin"
This court discussed "active appreciation" in at least two cases before Martin. In Brooks v. Brooks,[2] we stated that "[m]any courts have recognized two types of `causes' for the appreciation of separate propertypassive and active.... [A]ctive appreciation is the result of some affirmative action taken by one or both spouses which caused the increased value of the separate property."[3] Finding that the appreciation in that case was passive, and noting that "[w]e have never held that a non-titled spouse is entitled to share in the passive appreciation of separate property,"[4] we held that the non-titled spouse in Brooks was not entitled to share in the appreciation of the subject property.[5] Along the same lines, we held against the non-titled spouse in Miles v. Miles[6] because "[t]he superior court found that [the wife's] efforts were de minimis and did not constitute an active interest in [the husband's premarital properties], and her efforts did not contribute to the active appreciation of the properties."[7] And in Lowdermilk v. Lowdermilk,[8] while not using the phrase "active appreciation," we held that an increase in the value of the husband's separate business owing to the husband's "contributions of time and energy"[9] during the marriage was marital property. (Indeed, in Martin we cited Lowdermilk, a 1992 case, to support application of the doctrine of active appreciation.[10]) Under these circumstances, the suggestion that Christina did not have notice that the *1133 doctrine was available to her is simply not tenable.

B. "Substance of active appreciation argued"

The fact that "active appreciation" was a term (and a doctrine) used in our jurisprudence before the trial in Schmitz will not necessarily bar Christina from raising the issue on appeal if, as the Opinion says, "despite Christina's failure to use [the] precise phrase, she argued in substance that the court should apply the active appreciation standard."[11] Although a party may not present new issues or advance new theories on appeal, we have "adopted a liberal approach towards determining whether an issue or theory of a case was raised in a lower court proceeding."[12] We will allow a party to use an issue or a theory on appeal that was not used at the trial level if the underlying arguments (1) are not dependent on new facts, (2) are closely related to the trial pleadings, and (3) could have been gleaned from the pleadings.[13] Analysis of the proceedings in the superior court shows that Christina satisfied none of these three requirements.
(1) Are the underlying arguments dependent on new or controverted facts?
Christina did allege a few facts at trial that were relevant to a claim for active appreciation. Christina's trial brief notes that Michael "was primarily the breadwinner, and spent a great deal of time working away from home." He "devoted much of his marital efforts" to the accounting business, while "Tina had primary responsibility for the child and the home during the marriage." But she did not meet the first Zeman requirement because she did not submit sufficient evidence to prevail on the theory of active appreciation. Specifically, as discussed below at 1134, Christina failed even to introduce evidence of the value of the accounting business.[14] Because the theory of active appreciation requires a showing that an asset has increased in value, it is dependent here on new facts not introduced at trial.
(2) Is the argument closely related to the trial pleadings; could it have been gleaned from them?
Christina also fails to satisfy the second and third requirements of Zeman. She asserts on appeal that she "clearly made and relied upon" an active appreciation theory in her brief and proposed findings of fact,[15] albeit without expressly using that term. But contrary to Christina's assertions, the theory of active appreciation is not closely related to her trial pleadingswhich are directed solely to transmutation, a different theoryand active appreciation is not readily discernible from her trial submissions. Christina argued only a theory of transmutation in the trial court.[16] She stated that "the separate property of one spouse ... can be converted to marital property by the parties' intents or actions," and listed evidence often used to infer the intent to transmute separate *1134 property into marital property. She discussed "several items of initially separate property [that] were clearly converted into marital property," and other non-converted assets that "are not marital, [but] subject to invasion if an equitable division of marital property requires it." Christina then discussed the equitable factors for awarding her a share of Michael's property. But she never mentioned the appreciation of the property, the sine qua non of any active appreciation argument, whether explicit or inferred.
As further support for the conclusion that Christina did not advance an active appreciation theory, her evidentiary submissions at trial were devoid of any information showing the value of the business in question. Christina admits in her briefing to this court that "[n]o business valuation was done prior to trial for [the] business." A party arguing for the division of otherwise separate property under the theory of active appreciation must present evidence of the "increase in value of separate property owing to marital efforts."[17] Accordingly, without such evidence, the claim must fail. Christina's failure to present such evidence also shows that she did not make such a claim (and is an independent reason to affirm the superior court's decision, for the lack of evidence of value is a separate basis to reject an active appreciation theory, had one been presented).
Christina's proposed findings of factwhich in any event were submitted after the trial[18] and were therefore too late to raise a claim of active appreciationsimilarly suggested a transmutation argument, downplaying or ignoring any appreciation of the various properties at issue, and instead focusing on their total value at the time of trial or separation. Christina further implied a transmutation argument by stressing that deposits to the First National Bank accounts were "from clearly marital sources," that "it is not possible to segregate or identify separate and marital assets in the account[s]," and that "marital expenses were clearly paid from both First National accounts ..."
Finally, Christina's proposed conclusions of law explicitly mentioned transmutation, based on "the actions and intent of the parties," and made abundant use of the terms "commingled," "transmute," and "converted." They did not suggest appreciation. If Christina made an active appreciation argument at trial, it was not done sufficiently "clearly" as to be gleaned from her pleadings.
Christina argues that she "relied on Lowdermilk [v. Lowdermilk]"[19] at trial, thus presenting an active appreciation argument to the trial court "as completely as anyone could have" prior to the Martin decision. Christina's attorney did mention Lowdermilk in the opening statement. But the mere fact that Christina cited Lowdermilk at trial does not necessarily mean that she raised the active appreciation issue, because Lowdermilk involved both active appreciation and transmutation.[20] And in fact Christina's counsel raised Lowdermilk as support for her contention that Michael's "assets under the law should be viewed as having been converted to marital property." Furthermore, Christina's attorney also cited Green v. Green,[21] a case dealing exclusively with transmutation, in the same sentence as Lowdermilk, to support the same transmutation argument. Christina's attorney's opening statement referred to "conver[sion]" and "commingl[ing]" of separate property, which go to transmutation. The opening statement did not suggest that Michael's separate property should be considered marital as a result of active appreciation.
In sum, Christina did not plead enough facts at the trial level to support an active appreciation argument, such an argument is not closely related to her trial arguments, *1135 and it cannot be gleaned from her pleadings. Rather, Christina's case at trial focused only on the "conversion" of Michael's separate property to marital property, and did not even allude to the appreciation of any separate property as being a marital asset, much less present the evidence necessary for the trial court to rule on that basis (and that would have alerted the trial court to the theory that Christina now wishes to present).
Thus, Christina did not raise the claim of active appreciation at the trial level. The proposition that a party may not raise new arguments on appeal is almost as old as this court[22] and has been re-affirmed as recently as last month.[23] Even where the party failing to raise an issue is a pro se litiganta class for whom this court relaxes the rules[24] "the requirement that an issue be preserved by being presented in the superior court arises out of notions of judicial finality and efficiency, as well as fairness to the opposing party."[25] Christina is not a pro se litigant; indeed, she is represented here and was represented below by counsel for the appellant in Lowdermilk. Because Christina did not raise the claim of active appreciation at the trial level, I would resolve both the Schmitz & Buck and the Nugget Men's Store claims on that basis and affirm the decision of the superior court.
II. Correctness of attorney's fees rulings; ability to litigate fairly
Review of the underlying facts shows that the superior court's rulings concerning interim and final attorney's fees were clearly within the court's discretion and that Michael's behavior did not prevent Christina from fairly litigating her case. First, some context is in order.
The parties had been married for thirty-one months at the time they separated. Following the filing of the complaint for divorce, a trial setting order was issued in December 2001; trial was set for April 23, 2002. Christina moved for an award of interim attorney's fees on March 14, 2002, five weeks before trial. She stated that she had paid fees of $3,942.54 and had incurred another $2,000. Anticipating a two-day trial, she estimated that at least an additional $10,000 in fees would be incurred. She sought $15,000 in fees. On April 1, the court ordered the payment of $5,000 and added, "Father must pay Mother's counsel an equivalent amount that he pays his own counsel during the course of the proceedings. The court will review all attorney's fees at the end of the case." At that point, trial was to begin in twenty-two days.
Four days later, Christina moved to continue the trial. Although opposed by Michael, the continuance was apparently granted, for trial took place on May 28-30. In the motion to continue, Christina again argued for additional attorney's fees. But, contrary to the suggestion in today's Opinion, she did not definitively indicate an intention to seek a business valuation. What she said was, "[Christina] has the option, theoretically, of undertaking a business evaluation. But an evaluation of five business[es] would cost at least $15,000, and [Christina] cannot know whether it is even necessary, because she does not know Mike's position on the value of the businesses." (Emphasis added.) Moreover, Christina argued for a business valuation not to pursue a claim of active appreciation, but because the value of the businesses was substantial and because "[e]ven if they were, as Mike apparently believes, entirely separate, the Court must be able to determine their value in order to determine what an equitable distribution of marital property requires." The court denied further interim *1136 fees, noting "[i]f necessary the court will make an adjustment of attorney fees awards at the end of the case."
As it turned out, the trial took place less than six weeks after the renewed interim attorney's fees request became ripe. After trial, the court awarded almost $18,000 additional attorney's fees to Christina: another $10,000 in cash and credit of $7,975 in cash proceeds from the sale of two cars. In short, in a case in which Christina estimated on March 14 that attorney's fees would be about $16,000, and in which trial was completed on May 30 in three days, the court awarded her a total of $22,975 in fees.[26]
With this background, the court's conclusionthat Michael's failure to pay his attorney's fees during the brief interim between the court's order and the trial is a sufficient basis to remand the caseis puzzling. Judge Weeks's order, that Michael match any payment to his attorney by a payment to Christina's attorney, was obviously designed to force counsel for both parties into identical positions.[27] And it did just that. The parties were litigating on an even plane. Neither attorney, for a period of about six weeks, received payment. And the judge did what he said he would do: review the question of fees after the trial and make an award if necessary. After that review, he awarded an additional $17,975 to Christina.
Moreover, it is difficult to determine from the evidence in this case that Michael had any particular intent in not opening his attorney's billings, much less the intent to avoid paying Christina's legal fees and thus impede her ability to gather information about the value of his businesses. As Michael explained to Christina's counsel, in response to her question about not opening his attorney's billings: "II am just tired of the whole thing. I don't want to look at it. II was hoping we could get this settled a long time ago. And I'm justI haven't looked at anything." In any event, there is simply no basis for the court's conclusion that Michael did not pay his bills to avoid having to pay Christina's counsel.[28]
Finally, the court's conclusion that Michael's failure to pay his attorney's bill in the brief interim significantly affected Christina's ability to litigate her case depends on a series of unproven assumptions. The first is that the bills were of a sufficient amount to have made any difference. The record is silent in this regard. The second is that, had Christina's attorney received a payment during the period in question, she would have commissioned the evaluation that she earlier had spoken of only in theoretical terms. The last is that any such evaluation would have been used to try to show active appreciationa claim never raised by Christinarather than merely to give the court sufficient information so as to "determine what an equitable distribution of marital property requires"the purpose that Christina did cite in her memorandum of law.
Judge Weeks was fully aware of Christina's claim that she was entitled to greater interim fees and that she had not received interim payments beyond the $5,000 ordered in April. Christina's counsel filed a motion for reconsideration on May 20 and alerted the court to these facts. But there is nothing to suggest that the court abused its *1137 discretion in declining to order additional interim fees, or in making a final award of almost $23,000.[29]
In conclusion, the record shows that Christina failed to raise the claim of active appreciation in the trial court and that she therefore waived the issue. It also shows that the superior court acted well within its discretion in awarding interim and final fees. The record does not show that Michael's failure to pay his attorney for a period of about six weeks prevented Christina from raising a claim based on active appreciation. For these reasons, I respectfully dissent.
NOTES
[1] West v. West, 21 P.3d 838, 841 (Alaska 2001).
[2] Id.
[3] Id.
[4] Id.
[5] Martin v. Martin, 52 P.3d 724, 726 (Alaska 2002) (citing Lundquist v. Lundquist, 923 P.2d 42, 46-47 (Alaska 1996); Wanberg v. Wanberg, 664 P.2d 568, 570 (Alaska 1983)).
[6] Martin, 52 P.3d at 726 (citing Lundquist, 923 P.2d at 47).
[7] Martin, 52 P.3d at 726 (citing Brown v. Brown, 947 P.2d 307, 308 (Alaska 1997)).
[8] Id. (citing Alaska R. Civ. P. 52(a); Doyle v. Doyle, 815 P.2d 366, 368-69 (Alaska 1991)).
[9] Id. (citing Brotherton v. Brotherton, 941 P.2d 1241, 1244 (Alaska 1997)).
[10] Id. (citing Brown, 947 P.2d at 308).
[11] Sloane v. Sloane, 18 P.3d 60, 64 (Alaska 2001).
[12] Id.
[13] West v. West, 21 P.3d 838, 841 (Alaska 2001). AS 25.24.150(c) provides that

[i]n determining the best interests of the child the court shall consider
(1) the physical, emotional, mental, religious, and social needs of the child;
(2) the capability and desire of each parent to meet these needs;
(3) the child's preference if the child is of sufficient age and capacity to form a preference;
(4) the love and affection existing between the child and each parent;
(5) the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity;
(6) the desire and ability of each parent to allow an open and loving frequent relationship between the child and the other parent;
(7) any evidence of domestic violence, child abuse, or child neglect in the proposed custodial household or a history of violence between the parents;
(8) evidence that substance abuse by either parent or other members of the household directly affects the emotional or physical well-being of the child;
(9) other factors that the court considers pertinent.
[14] West, 21 P.3d at 842.
[15] Id. at 841-42.
[16] PRINCIPLES OF THE LAW OF FAMILY DISSOLUTION: ANALYSIS AND RECOMMENDATIONS § 2.18 cmt. b (Tentative Draft No. 3, 1998).
[17] Id.
[18] Id.
[19] Elliott v. Settje, 27 P.3d 317, 318-19 (Alaska 2001).
[20] Id. at 319.
[21] Id.
[22] Id.
[23] Id. at 324.
[24] Siekawitch v. Siekawitch, 956 P.2d 447, 449 (Alaska 1998) (footnote and internal quotations omitted).
[25] Id. (quoting Cushing v. Painter, 666 P.2d 1044, 1046 (Alaska 1983)).
[26] Martin v. Martin, 52 P.3d 724, 726 (Alaska 2002); Wanberg v. Wanberg, 664 P.2d 568, 570 (Alaska 1983).
[27] BRETT R. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 5.23, at 263 (2d ed.1994).
[28] Michael claims that Christina failed to argue below that active appreciation be applied to the couple's property distribution. Michael asserts correctly that Christina did not mention the phrase "active appreciation" in her trial brief or in her proposed findings of fact. However, Michael's argument fails because despite Christina's failure to use this precise phrase, she argued in substance that the court should apply the active appreciation standard. She maintained that "several items of initially separate property were clearly converted into marital property. These properties include: ... Mike's business interests, including at the very least his accounting business, to which he devoted much of his marital efforts." Furthermore, as Christina points out, we first fully explored and discussed the label "active appreciation" in Martin v. Martin, 52 P.3d 724 (Alaska 2002), a case which was decided after the Schmitz divorce trial. Given that we had not yet analyzed and examined in depth the doctrine of active appreciation when Christina argued her case below and given that she arguably raised the active appreciation standard when she discussed marital efforts used to manage or improve separate property, we conclude that Christina adequately raised the issue below.
[29] Lundquist v. Lundquist, 923 P.2d 42, 47 (Alaska 1996); see also Green v. Green, 29 P.3d 854, 857 (Alaska 2001) ("Alaska Statute 25.24.160(a)(4) provides that the court may divide the parties' property `whether joint or separate, acquired only during marriage.' Therefore, the first step of dividing property involves identifying all property acquired during marriage as available for distribution. Marital property identified in this first step is then valued and is divided.").
[30] Lundquist, 923 P.2d at 47.
[31] Lewis v. Lewis, 785 P.2d 550, 558 (Alaska 1990).
[32] Harrower v. Harrower, 71 P.3d 854, 857 (Alaska 2003).
[33] Id.; Green, 29 P.3d at 857; Lundquist, 923 P.2d at 47; Martin v. Martin, 52 P.3d 724, 727 & n. 8 (Alaska 2002) (citing Sampson v. Sampson, 14 P.3d 272, 277 (Alaska 2000)).
[34] Harrower, 71 P.3d at 857-58; see also Lowdermilk v. Lowdermilk, 825 P.2d 874, 877-78 (Alaska 1992); Martin, 52 P.3d at 727 n. 10.
[35] Lowdermilk, 825 P.2d at 877.
[36] Id. at 878.
[37] Harrower, 71 P.3d at 858.
[38] Id.
[39] Id. (citing TURNER, supra note 27, § 5.22, at 236).
[40] Id. at 859 (citing TURNER, supra note 27, § 5.22, at 236 ("There is general agreement that the burden of proving marital contributions and the burden of proving an increase in value are on the spouse who seeks to classify appreciation as active.")).
[41] Id. at 859.
[42] See, e.g., Hartland v. Hartland, 777 P.2d 636, 639-40 (Alaska 1989). In her motion to continue the trial, Christina listed items of "trial preparation that cannot be completed" due to a lack of financial resources, including an item entitled "business valuation." Christina pointed out that Michael has "never stated what he believes the value of his businesses to be, and takes the position, apparently, that he does not intend to." She told the court that this made "it difficult if not impossible for [Christina] to propose a distribution of property" and pointed out that "a valuation of five businesses would cost at least $15,000...." She maintained that despite the trial court's order that Michael pay her an amount equivalent to that paid to his own counsel during the course of the proceedings, this order had "not yet had any impact on [Christina's] trial preparation, because she has yet to receive any funds" and she had "no ability to finance additional trial preparation until she receives funds from [Michael]." Several weeks laterand still over a month before trialChristina filed a motion to clarify the trial court's order regarding interim attorney's fees. There, she argued that if she did not receive a payment of interim fees, she would "not have the ability to gather and analyze evidence that [Michael] has had throughout the case." She complained that despite the trial court's order that Michael pay her an equivalent amount of fees, Michael had "supplied no information ... about the amount of fees he has paid or incurred."
[43] See TURNER, supra note 27, § 5.23, at 263.
[44] Id.; AS 25.24.160(a)(4); see also Lewis v. Lewis, 785 P.2d 550, 558 (Alaska 1990) (noting that marital property includes all property acquired during marriage, "excepting only inherited property and property acquired with separate property which is kept as separate property").
[45] TURNER, supra note 27, § 5.23, at 263.
[46] Id. at 264.
[47] Id.
[48] Id. at 263-64.
[49] Id. at 264.
[50] Id.
[51] Id.
[52] Id.
[53] Id. at 265.
[54] Id. at 266.
[55] Id.
[56] Id. at 266 n. 591; Carlson v. Carlson, 722 P.2d 222, 224 (Alaska 1986) ("[T]he act of commingling, in itself, does not automatically establish intent to jointly hold property, and a court always should consider the property's source when determining what assets are available for distribution.").
[57] Brown v. Brown, 947 P.2d 307, 311 (Alaska 1997); Chotiner v. Chotiner, 829 P.2d 829, 833 (Alaska 1992).
[58] TURNER, supra note 27, § 5.23, at 266-67.
[59] Id. at 266.
[60] Id. at 268.
[61] We note that Michael argues that even though both marital and separate property contributions were made to the First National Bank accounts, "the entire marital income [of $132,100] was expended during the marriage." He contends that "the accounts increased in value due to the deposits of both marital income and income from ex-husband's separate interests, but the withdrawals were made to pay only marital expenses," thus the only funds left in the accounts are his separate property. We reject this argument.
[62] For example, as noted above, Michael asserts that $132,100 in marital property was deposited into his First National Bank checking account, and that $65,500 total in separate property was deposited into the First National Bank accounts. If the evidence supports Michael's contentions, the trial court could determine that sixty-seven percent (given the ratio of $65,500-to-$132,100, separate-to-marital contributions to the accounts) of the accounts were marital property available for distribution.
[63] Edelman v. Edelman, 3 P.3d 348, 356 (Alaska 2000).
[64] Id.
[65] AS 25.24.140 states in pertinent part:

Orders during action. (a) During the pendency of the action, a spouse may, upon application and in appropriate circumstances, be awarded expenses, including
(1) attorney fees and costs that reasonably approximate the actual fees and costs required to prosecute or defend the action; in applying this paragraph, the court shall take appropriate steps to ensure that the award of attorney fees does not contribute to an unnecessary escalation in the litigation.
[66] Sloane v. Sloane, 18 P.3d 60, 64 (Alaska 2001).
[67] Dodson v. Dodson, 955 P.2d 902, 914 (Alaska 1998).
[68] Id.
[69] Id.
[70] Lone Wolf v. Lone Wolf, 741 P.2d 1187, 1192 (Alaska 1987).
[71] Charpie v. Charpie, 271 A.D.2d 169, 710 N.Y.S.2d 363, 364 (N.Y.App.Div.2000) (citation and internal quotations omitted).
[72] Dana E. Prescott, Interim Attorneys' Fees and Expert `Costs' in Divorce: Ask and Your Client May Receive, 18 Me. B.J. 40, 40 (2003).
[73] After Michael filed for divorce, the court issued a domestic relations standing order, which provided, among other things, that neither party

may dispose of, encumber, transfer, or otherwise dispose of any marital property ... without the written consent of the other party, which shall not be unreasonably withheld, or the prior approval of the court, except that a party may make reasonable use of the funds for the parties' and the parties' children's expenses, which shall include reasonable attorney's fees necessary to prosecute or defend the action.
[74] Christina separately argues that the superior court erred in its division of property by giving the Expedition its book value ($23,525), rather than the sale value Christina actually received ($16,995), thus effectively assuming that Christina sold the car for less than its fair market value. However, our review of the record convinces us that the trial court's decision to give the Expedition its book value was not clearly erroneous.
[1] 52 P.3d 724 (Alaska 2002).
[2] 733 P.2d 1044 (Alaska 1987).
[3] Id. at 1054 n. 22 (emphasis added) (citing J. MCCAHEY, VALUATION AND DISTRIBUTION OF MARITAL PROPERTY, § 18.06 (1985)).
[4] Id. at 1054.
[5] Id.
[6] 816 P.2d 129 (Alaska 1991).
[7] Id. at 131 (emphasis added).
[8] 825 P.2d 874 (Alaska 1992).
[9] Id. at 878.
[10] 52 P.3d at 727 n. 10.
[11] Opinion at 1124, n. 28.
[12] Zeman v. Lufthansa German Airlines, 699 P.2d 1274, 1280 (Alaska 1985) (citing O'Neill Investigations v. Illinois Employers Ins., 636 P.2d 1170, 1175 n. 7 (Alaska 1981)).
[13] Id.
[14] I discuss in Part II the claim that Christina's ability to prove her case was jeopardized by her lack of funds to pay her attorney.
[15] The proposed findings of fact and conclusions of law were submitted June 14, 2002 after the trial, which was held in late May. Accordingly, I would not attach significance to the claim that Christina relied upon "active appreciation" in the proposed findings and conclusions. In any event, she did not. See discussion infra at 1133-34.
[16] The Opinion's one citation to support the proposition that Christina "argued in substance that the court should apply the active appreciation standard" is found in Christina's trial brief, which argued only transmutation: "In this case, several items of initially separate property were clearly converted into marital property. These properties include: ... Mike's business interests, including at the very least his accounting business, to which he devoted much of his marital efforts." (Emphasis added.) Only the very last clause quoted even hints at a theory of active appreciation, but it is far too truncated to fairly apprise the court and the opposing party that Christina is advancing an entirely different theory from transmutation.
[17] Martin, 52 P.3d at 727 n. 10.
[18] See supra n. 15.
[19] 825 P.2d 874 (Alaska 1992).
[20] Id. at 877 (active appreciation: "increase in [husband's business's] tangible assets acquired after the marriage"); 878 (transmutation: property "may be considered a premarital asset so long as the parties did not demonstrate an intent to jointly hold the property").
[21] 29 P.3d 854 (Alaska 2001).
[22] See Pollastrine v. Severance, 375 P.2d 528, 531 (Alaska 1962) (failure to raise issue in proceeding below precludes consideration of issue on appeal), citing Brown v. Music, Inc., 359 P.2d 295, 301 (Alaska 1961).
[23] Christopher D. v. State, Dep't of Health and Soc. Servs., 2004 WL 243556 (Alaska, Feb. 11, 2004) (well-established that supreme court will not consider on appeal issue that was not raised in trial court).
[24] Breck v. Ulmer, 745 P.2d 66, 75 (Alaska 1987) (holding that pro se litigants should be held to less stringent standards than lawyers).
[25] Pieper v. Musarra, 956 P.2d 444, 446 (Alaska 1998) (holding that pro se litigant waived issue on appeal by failing to raise it in trial court).
[26] After trial Christina's attorney filed a certificate that Christina had been billed a total of $47,076 in fees for the case, of which counsel had been paid $33,401.
[27] Such orders put the parties on equal planes because, regardless of the imbalance of wealth or income between the parties, counsel are financed equally. And when such an order is backed with notice that, at the end of the trial, the court will review the issue and make a final award of fees if necessary, there is the strongest assurance that neither party will have a litigation advantage. While counsel representing the advantaged spouse may rely on the knowledge that she will be paid out of her client's assets, counsel representing the disadvantaged spouse may rely on the knowledge that the court has broad power to order an award of fees, regardless of the prevailing party. AS 25.24.140(a)(1); Cooke v. Cooke, 625 P.2d 291, 293 (Alaska 1981). Indeed, the court has access to the entire marital estateand even to the separate assets of the other spouse acquired before marriage, if necessary to effect an equitable property division. AS 25.24.160(a)(4).
[28] Whatever an appellate court might suspect about a party's motives from the bare fact of non-payment of one's own attorney's bills for a brief period, it is for the trial court, not the appellate court, to make findings of fact.
[29] Judge Weeks was also presumably aware of the legislature's command, in AS 25.24.140(a)(1), that, in exercising its power to award attorney's fees during the action, "the court shall take appropriate steps to ensure that the award of attorney's fees does not contribute to an unnecessary escalation in the litigation."